UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                          CRIM. NO. 15-116 (DWF/JSM)

      Plaintiff,

v.                                                 REPORT & RECOMMENDATION
                                                   (REDACTED)
(1) MEKIEL MOORE, and
(2) JASON CLAYBRON

      Defendants.


This matter is before the Court upon defendant Moore's Motion to Suppress

Confessions, Admission or Statements Made in the Nature of Confessions Made by the

Defendant [Docket No. 32]; defendant Moore's Motion to Suppress Evidence Obtained

Through Illegal Search [Docket No. 33]; defendant Claybron's Motion to Suppress

Evidence Obtained as a Result of Electronic Tracking of Phone Number (612) XXX-

XXXX [Docket No. 41]; defendant Claybron's Motion to Suppress Evidence Obtained as

a Result of Electronic Tracking of Phone Number (952) XXX-XXXX [Docket No. 42];

defendant Claybron's Motion to Suppress Evidence Obtained as a Result of Electronic

Tracking of Nissan Juke Bearing MN Plate 357XXX [Docket No. 43]; defendant

Claybron's Motion to Suppress Evidence Obtained as a Result of Unlawful Stop, Search

and Seizure of Defendant [Docket No. 44]; defendant Claybron's Motion to Suppress

the Statement of Defendant [Docket No. 45]; defendant Claybron's Motion to Suppress

Evidence Obtained as a Result of Unlawful Search at XXXX Desoto St. [Docket No. 46];

defendant Claybron's Motion to Suppress Evidence Obtained as a Result of Unlawful

Search at XXXX East 10th St. Apt. XXXX [Docket No. 47]; defendants' Joint Motion to

Supplement Defendants' Motions to Suppress Evidence [Docket No. 52]; and defendants' Joint Motion for a Franks Hearing [Docket No. 53].

Jeff Paulsen, Assistant United States Attorney, appeared on behalf of the Government. Charles L. Hawkins, Esq. appeared on behalf of defendant Mekiel Moore, who was personally present. Paul J. Edlund, Esq. appeared on behalf of defendant Jason Claybron, who was personally present. The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

# I. MOTIONS TO SUPPRESS SEARCH WARRANTS FOR ELECTRONIC TRACKING

## A. Phone Numbers (612) XXX-XXXX and (952) XXX-XXXX

Defendant Jason Claybron has moved the Court for an order suppressing any evidence obtained as a result of electronic tracking of phone numbers (612) XXX-XXXX and (952) XXX-XXXX on the grounds that the warrants authorizing the electronic tracking were issued without a sufficient showing of probable cause in the supporting affidavits. [Docket Nos. 41, 42]. At the hearing on June 25, 2015, Claybron's counsel and the Government agreed that the motions could be resolved based upon the four corners of the warrants and supporting affidavits. Transcript of Motions Hearing held on June 25, 2015 ("Tr. I") at 16-17.

The Government opposed Claybron's motions, arguing that the affidavits in support of the search warrants set forth the results of the investigation into Claybron's heroin trafficking activities and established ample probable cause for the search. Consolidated Response of the United States to Defendant's Pretrial Motions ("Gov't Resp. I"), pp. 1-2 [Docket No. 48]. In the alternative, the Government submitted that

suppression is not required because the officer executing the searches relied in good faith on the existence of a facially valid warrant.  Id., p. 3 (citing United States v. Leon, 468 U.S. 897 (1984)).

### 1.    Factual Background

On March 3, 2015, Detective Travis Serafin of the Hennepin County Sheriff's Office submitted an application with a supporting affidavit for the installation and use of a pen register, trap and trace device, electronic tracking device, GPS technology, and E911 location technology for phone number (612) XXX-XXXX, and for the disclosure of subscriber, cell site, and call detail information.  Gov't Ex. 3, pp. 5-9.[1]  In his affidavit, Detective Serafin attested that the Hennepin County Sheriff's Office Southwest Hennepin Drug Task Force was conducting a criminal investigation of an individual known as "Hood" for narcotics trafficking.  Id., p. 6.  According to Detective Serafin, the suspect in the investigation was utilizing phone number (612) XXX-XXXX, possibly listing to "Hood" or another person, and located at an unknown location, in furtherance of the subject offenses, and the information to be obtained from electronic tracking was relevant to the ongoing criminal investigation.  Id.

In support of his application for electronic tracking, Detective Serafin provided the following information relevant to the motion:

> Detective Travis Serafin has successfully assisted with the aforementioned technology in previous investigations which has resulted in the development/collection of evidence and the apprehension of suspects.
>
> Your affiant received information from a confidential informant (CI) that a person known as "Hood" who is trafficking controlled substances in Minnesota.

---

[1]    The pages of Government Exhibit 3 were not numbered.  For the convenience of citing, the Court has numbered them.

This CI has provided your affiant with names, phones [sic] numbers, and addresses of people involved in narcotics trafficking in the past. This information has led to seizures of controlled substances and arrests of those individuals involved in narcotics trafficking.

\*\*\*

Your affiant learned from the CI that "Hood" has been involved in trafficking controlled substances identified as Heroin for the past two years, in Minnesota. The CI identified a phone number utilized by "Hood" as 612-XXX-XXXX. The CI described "Hood" as a dark skinned black male with a short and stocky build. The CI believes that "Hood" is a member of a criminal street gang identified as the Gangster Disciples. The CI informed your affiant that "Hood" works with other individuals, who are unknown to your affiant, in the distribution [of] Heroin in the Saint Paul/Minneapolis area.

Your affiant has learned that "Hood" is currently using the cellular number identified as 612-XXX-XXXX to conduct narcotics trafficking. Your affiant has learned the phone number identified as 612-XXX-XXXX is owned by Sprint Communications. The CI has spoken with "Hood" at the phone number identified as 612-XXX-XXXX and has discussed narcotics transactions.

Your affiant believes that "Hood" is in control of this phone with the number 612-XXX-XXXX. Your affiant believes that "Hood" utilizes this phone to facilitate narcotics trafficking.

\*\*\*

Gov't Ex. 3, pp. 7-8.

On March 3, 2015, Hennepin County District Court Judge Jay Quam, issued an order authorizing electronic tracking on phone number (612) XXX-XXXX. Id., pp. 1-4. Judge Quam found that there was probable cause to believe that the person possessing the targeted phone number had committed, and was continuing to commit, narcotics trafficking crimes and that electronic tracking would result in the discovery of evidence of narcotics trafficking. Id., p. 1.

On March 13, 2015, Deputy Josh Williams of the Hennepin County Sheriff's Office submitted an application with supporting affidavit for the installation and use of a pen register, trap and trace device, electronic tracking device, GPS technology, and E911 location technology for phone number (952) XXX-XXXX, and for the disclosure of subscriber, cell site, and call detail information.  Gov't Ex. 4, pp. 5-9.[2]

Deputy Williams attested that the Hennepin County Sheriff's Office Southwest Hennepin Drug Task Force was conducting a criminal investigation of an individual known as "Hood" for narcotics trafficking.  Id., p. 6.  Deputy Williams further attested that the suspect in the investigation was using phone number (952) XXX-XXXX, possibly listing to "Hood" or another person, and located at an unknown location, in furtherance of the subject offenses, and the information to be obtained from electronic tracking was relevant to the ongoing criminal investigation.  Id.

Relevant to the motion, Deputy Williams submitted the following information in support of his application:

> Deputy Williams has successfully assisted with the aforementioned technology in previous investigations which has resulted in the development/collection of evidence and the apprehension of suspects.

> Your Affiant received information from a confidential informant (CI) that a person known as "Hood" who is trafficking controlled substances in Minnesota.

> This CI has provided your Affiant with names, phones [sic] numbers, and addresses of people involved in narcotics trafficking in the past.  This information has led [to] arrests of those individuals involved in narcotics trafficking.

***

---

[2]   The pages of Government Exhibit 4 were not numbered.  For the convenience of citing, the Court has numbered them.

Your Affiant learned from the CI that "Hood" has been involved in trafficking controlled substances identified as Heroin for the past two years, in Minnesota.   The CI identified a phone number utilized by "Hood" as 612-XXX-XXXX.   The CI described "Hood" as a dark skinned black male with a short and stocky build.   The CI believes that "Hood" is a member of a criminal street gang identified as the Gangster Disciples.   The CI informed your Affiant that "Hood" works with other individuals, who are unknown to your Affiant, in the distribution [of] Heroin in the Saint Paul/Minneapolis area.

Your Affiant is aware that Detective Serafin, with the Hennepin County Sheriff's Office Southwest Hennepin Drug Task Force, presented a search warrant for the cellular phone number identified as 612-XXX-XXXX.   Your Affiant knows that the Honorable Quam reviewed and signed a search warrant for a cellular phone number identified as 612-XXX-XXXX on March 3, 2015.

Your Affiant learned from a CI that "Hood" utilizes multiple cellular phones to assist him in narcotics trafficking.   Your Affiant has learned that "Hood" is currently using the cellular number identified as 952-XXX-XXXX to conduct narcotics trafficking.   Your affiant has learned the phone number identified as 952-XXX-XXXX is owned by Sprint Communications.

Your Affiant believes that "Hood" is in control of this phone with the number 952-XXX-XXXX.   Your affiant believes that "Hood" utilizes this phone to facilitate narcotics trafficking.

\*\*\*

Gov't Ex. 4, pp. 7-8.

On March 13, 2015, Hennepin County District Judge Daniel Moreno issued an order authorizing electronic tracking on phone number (952) XXX-XXXX, having found probable cause to believe that the person using the targeted phone number had committed, and was continuing to commit, narcotics trafficking offenses.  Id., pp. 1-4. Judge Moreno also found that electronic tracking of (952) XXX-XXXX was likely to uncover relevant evidence of narcotics trafficking.  Id., p. 1.

### 2.   Analysis

When a search is executed pursuant to a warrant, a court must determine whether the warrant was supported by probable cause.   United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007) (citing Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998)).  "'Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place.'"   United States v. Rodriguez, 711 F.3d 928, 936 (8th Cir. 2013) (quoting United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000)).

"Probable cause is a 'fluid concept;' therefore, magistrates should read affidavits with common sense and 'not in a grudging, hyper technical fashion.'"   United States v. Caswell, 436 F.3d 894, 897 (8th Cir. 2006) (quoting Walden, 156 F.3d at 870).  As such, the task of a court issuing a search warrant is to "'make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"   Id. (quoting Walden, 156 F.3d at 870); see also United States v. Hyer, 498 F. App'x 658, 660 (8th Cir. 2013) ("[P]robable cause is a practical, factual, and nontechnical concept, dealing with probabilities. The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit.") (internal quotation marks and citations omitted); cf. United States v. Howe, 591 F.2d 454, 457 (8th Cir. 1979) ("For federal agents to establish probable cause to search it is necessary only to demonstrate with

some degree of reasonableness that federal criminal activity is 'probable,' not that it exists beyond a reasonable doubt.") (citations omitted).

When reviewing the decision of the issuing judge, a district court must ensure that the he or she had a substantial basis for concluding that probable cause existed. Gates, 462 U.S. at 238-39 (citation omitted); see also United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996) ("Our duty as the reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed . . . .") (citation omitted).   In doing so, a reviewing court must give "great deference to the [issuing judge]'s probable cause determination."   Caswell, 436 F.3d at 897 (citing United States v. Arenal, 768 F.2d 263, 266 (8th Cir.1985)).   And "in doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants."   Leichtling, 684 F.2d at 555 (quoting United States v. Christenson, 549 F.2d 53 (8th Cir. 1977)).

At the same time, "[c]onclusory statements made by affiants fail to give the issuing [judge] a substantial basis for determining that probable cause exists."   United States v. Summage, 481 F.3d 1075, 1077-78 (8th Cir. 2007) (quoting Caswell, 436 F.3d at 897-98).   "Sufficient information must be presented to the [issuing judge] to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."   Id. (quoting Gates, 462 U.S. at 239).

"Probable cause may be found in hearsay statements from reliable persons; in hearsay statements from confidential informants corroborated by independent investigation; or in observations made by trained law enforcement officers."   Walden, 156 F.3d at 870 (internal citations omitted).   "Where probable cause depends upon

information supplied by an informant, '[t]he core question ... is whether the information is reliable.'"  United States v. Keys, 721 F.3d 512, 518 (8th Cir. 2013) (citing United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)), cert. denied, 134 S. Ct. 1011 (2014). "'Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'"  United States v. O'Dell, 766 F.3d 870, 874 (8th Cir. 2014) (quoting Williams, 10 F.3d at 593); see also United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998) ("The reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information.") (citation omitted).  "The statements of a reliable confidential informant are themselves sufficient to support probable cause for a search warrant."  United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008) (quotation and citations omitted); see also United States v. Pressley, 978 F.2d 1026, 1027 (8th Cir. 1992) ("It is well settled that the statements of a reliable informant can provide, by themselves, a sufficient basis for the issuance of a warrant."  (citing McCray v. Illinois, 386 U.S. 300, 1967)).

Based upon the above principles, the Court concludes that Detective Serafin's supporting affidavit provided sufficient information from which a reasonable person could conclude that evidence of narcotics trafficking would be found through electronic tracking of phone number (612) XXX-XXXX.

First, Detective Serafin's affidavit established a sufficient nexus between narcotics trafficking activity and the phone number to be searched.  See United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly

issue….'") (quoting United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000)).

Detective Serafin had received a tip from a CI that an individual known as "Hood" was

trafficking heroin in Minnesota and had done so for the past two years. The CI provided

a physical description of "Hood" and indicated that "Hood" was a member of a criminal

street gang. Further, and importantly, Detective Serafin attested that the CI actually

spoke with "Hood" at phone number (612) XXX-XXXX and discussed narcotics

transactions. All of this information provided a sufficient link between "Hood," phone

number (612) XXX-XXXX, and narcotics trafficking activity.

Second, although Detective Serafin did not corroborate the information provided

by the CI, Judge Quam nonetheless had a substantial basis to believe that the

information was reliable because the CI had provided truthful information leading to the

arrest of individuals involved in narcotics trafficking in the past. As such, Judge Quam

could reasonably infer that the information provided by the CI in the instant

investigation, though uncorroborated, was reliable. See United States v. Williams, 477

F.3d 554, 560 (8th Cir. 2007) ("Despite the lack of independent corroboration, the

judicial officer issuing the warrant knew that Conway had provided truthful and useful

information and had made controlled drug purchases for the police department on five

previous occasions.") (citation omitted); United States v. Oates, 68 F.3d 479 (8th Cir.

1995) ("We conclude the information set forth in the affidavit was sufficiently reliable to

support the municipal court judge's finding of probable cause, given the officer's

attestation that the CI had a track record of supplying reliable information.") (citing

Williams, 10 F.3d at 593); cf. United States v. Smith, 2011 WL 5119128, at *5 (W.D. Mo.

Oct. 6, 2011) ("[T]he information provided by the second confidential informant is

sufficient because it is partially corroborated first-hand knowledge provided by a known and historically reliable informant.") (citing <u>Williams</u>, 10 F.3d at 593), <u>report and recommendation adopted</u>, 2011 WL 5118980 (W.D. Mo. Oct. 27, 2011), <u>aff'd</u>, 557 F. App'x 606, 607 (8th Cir. 2014).

Accordingly, the Court concludes that under the totality of the circumstances, the information provided in Detective Serafin's affidavit established probable cause for the authorization of electronic tracking on phone number (612) XXX-XXXX.[3]

However, the same cannot be said for the affidavit of Deputy Williams and the warrant authorizing electronic tracking of phone number (952) XXX-XXXX. Although Deputy Williams' affidavit is substantially similar to Detective Serafin's affidavit, there is one key difference. Unlike Detective Serafin, Deputy Williams did not attest that the CI ever spoke to "Hood" at phone number (952) XXX-XXXX to discuss narcotics transactions. Rather, Deputy Williams simply stated that he "ha[d] learned that 'Hood' is currently using the cellular number identified as 952-XXX-XXXX to conduct narcotics trafficking." Gov't Ex. 4, p. 7. Deputy William's never explained how he learned that "Hood" was using phone number (952) XXX-XXXX and never disclosed whether this information came from the CI or some other source. Although the affidavit alleged that Deputy Williams had learned from the CI that "Hood" utilized multiple cellular phones to assist in narcotics trafficking, that fact does not link "Hood" to any particular phone

---

[3]     Because the warrant authorizing electronic tracking of phone number (612) XXX-XXXX was supported by probable cause, the Court need not determine whether the <u>Leon</u> good-faith exception should apply. However, even if it was not supported by probable cause, the Court notes that the warrant was not facially deficient or so lacking in indicia of probable case that no reasonable officer would have believed it to be valid. <u>See</u> United States v. Perry, 531 F.3d 662, 665 (8th Cir. 2008). Thus, under the totality of the circumstances, Detective Serafin had reasonable grounds to believe that the warrant was properly issued, and therefore, the good-faith exception would apply.

number, much less (952) XXX-XXXX in particular.  In other words, Deputy Williams'
affidavit failed to establish a sufficient nexus between "Hood," phone number (952)
XXX-XXXX, and narcotics trafficking activity such that a reasonable person could
conclude that evidence of narcotics trafficking would be found through electronic
tracking of (952) XXX-XXXX.

Recognizing that this Court must not read affidavits in a grudging, hyper-
technical fashion, Deputy Williams' failure to set forth the basis of knowledge for his
allegation that "Hood" was using phone number (952) XXX-XXXX in furtherance of
narcotics trafficking activity is fatal to the finding of probable cause, particularly where
the information alleged in the affidavit was uncorroborated.  Therefore, notwithstanding
the great deference due to the issuing judge's probable cause determination, this Court
concludes that Judge Moreno did not have a substantial basis to find that probable
cause existed to authorize electronic tracking of phone number (952) XXX-XXXX.

Because the warrant authorizing electronic tracking of phone number (952) XXX-
XXXX was not supported by probable cause, the Court must determine whether the
Leon good-faith exception should apply.

> Under the [Leon] good-faith exception, evidence seized
> pursuant to a search warrant that lacked probable cause is
> admissible if the executing officer's good-faith reliance on the
> warrant is objectively reasonable. The good-faith inquiry is
> confined to the objectively ascertainable question whether a
> reasonably well trained officer would have known that the
> search was illegal despite the [issuing judge's] authorization.

Perry, 531 F.3d at 665 (citing Proell, 485 F.3d at 430-31 (alterations in original) (internal
quotations omitted).

In <u>Leon</u>, the Supreme Court explained that "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'"  468 U.S. at 922 (citations omitted).  Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued."  <u>Id.</u> at 922-23 (footnote omitted).

> <u>Leon</u> identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

<u>Perry</u>, 531 F.3d at 665 (quoting <u>Proell</u>, 485 F.3d at 431).  With respect to the third exception, the Eighth Circuit explained: "'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in <u>Leon</u> or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words." <u>Proell</u>, 485 F.3d at 432 (quoting <u>United States v. Carpenter</u>, 341 F.3d 666, 670 (8th Cir. 2003)).

In this case, there is no evidence suggesting that the supporting affidavits contained a false statement[4] or that Judge Moreno wholly abandoned his judicial role.

---

[4]     Defendants have jointly filed a motion for a <u>Franks</u> hearing on the grounds that the applications accompanying the various search warrants, including those for electronic tracking, included intentional or reckless misrepresentations or omissions of fact.  [Docket No. 53].  This motion will be addressed in Section VI, <u>infra</u>.

As for the third and fourth exceptions, the Court does not find that the affidavit was facially deficient or entirely lacking in indicia of probable cause such that no reasonable law enforcement officer would presume the warrant to be valid.  Rather, the affidavit set forth specific information concerning "Hood" and his narcotics trafficking activities, including "Hood's" physical description and association with a criminal street gang.  This information was provided by a reliable CI who had previously provided truthful information leading to the arrest of individuals involved in narcotics trafficking.  Additionally, Deputy Williams was aware that Judge Quam had signed a search warrant for phone number (612) XXX-XXXX, which was supported by an affidavit nearly identical to the one submitted by Deputy Williams.  Accordingly, based upon all the facts and circumstances of this case, it was not entirely unreasonable for Deputy Williams to rely on Judge Moreno's issuance of the search warrant.  Claybron's motion to suppress should be denied.

### B.  <u>Nissan Juke</u>

On June 18, 2015, Claybron moved the Court for an order suppressing any evidence obtained as a result of electronic tracking of a Nissan Juke bearing Minnesota License Plate 357XXX on the grounds that the warrant authorizing electronic tracking was issued without a sufficient showing of probable cause in the supporting affidavit. [Docket No. 43].   At the hearing on June 25, 2015, Claybron's counsel and the Government agreed that the motion could be resolved based upon the four corners of the warrant and supporting affidavit.  Tr. I at 17.

In response to Claybron's motion, the Government contended that there was no basis for suppressing the results of electronic tracking of the Nissan Juke because the

supporting affidavit set forth the results of the investigation and established probable cause for the search.  Gov't Resp. I, pp. 2-3.

### 1.    Factual Background

On March 22, 2015, Detective Serafin submitted an application and supporting affidavit for the installation and use of an electronic and mechanical mobile tracking device on a Nissan Juke bearing Minnesota License 357XXX.  Gov't Ex. 5, pp. 1-5.[5]

In his supporting affidavit, Detective Serafin attested that the Southwest Hennepin Drug Task Force was conducting a criminal investigation of Claybron for heroin trafficking.  Id., p. 1.  According to Detective Serafin, the suspect of the investigation was using a Nissan Juke, Minnesota license 357XXX, possibly belonging to Claybron or another person, located at a known or unknown location, in furtherance of narcotics trafficking, and the information likely to be obtained from electronic tracking would be relevant to the offense of narcotics trafficking.  Id.

Detective Serafin attested that he had been conducting an ongoing felony investigation of Claybron for distribution of controlled substances.  Id., p. 2.  Detective Serafin had received information from a CI that a person known as "Hood" was trafficking controlled substances for the past two years in Minnesota.  Id.  This CI had provided Detective Serafin with names, phone numbers, and addresses of individuals involved in narcotics trafficking in the past, which had led to the arrest of those individuals involved in narcotics trafficking.  Id.

Detective Serafin had learned from the CI that "Hood" had been involved in heroin trafficking in Minnesota for the past two years.  Id.  The CI described "Hood" as a

---

[5]     The pages of Government Exhibit 5 were not numbered.  For the convenience of citing, the Court has numbered them.

dark-skinned black male with a short and stocky build.  Id.  The CI also informed Detective Serafin that he believed "Hood" was a member of the criminal street gang known as the Gangster Disciples, and that "Hood" worked with other unknown individuals in the distribution of heroin in the Saint Paul-Minneapolis area.  Id.

According to Detective Serafin, the CI had identified a phone number used by "Hood" as (612) XXX-XXXX.  Id.  On March 3, 2015, Detective Serafin presented a search warrant for (612) XXX-XXXX, which was signed by Judge Quam of the Hennepin County District Court.  Id.

Detective Serafin learned from the CI that "Hood" utilized multiple cellular phones in furtherance of narcotics trafficking.  Id.  Detective Serafin also learned that "Hood" was currently using the cell phone number (952) XXX-XXXX to conduct narcotics trafficking.  Id.  Judge Moreno of the Hennepin County District Court signed a search warrant for (952) XXX-XXXX on May 13, 2015.[6]  Id., pp. 2-3.

Detective Serafin attested that the CI had identified "Hood" as Jason Claybron.  Id., p. 3.  Detective Serafin was shown a photo of Claybron, and Detective Serafin verified Claybron's identity with a Hennepin County booking photo taken in 2015.  Id.  Detective Serafin learned through the booking photo that Claybron was a black male, approximately 5'4" tall and weighing about 161 pounds.  Id.

Through electronic surveillance of phone numbers (612) XXX-XXXX and (952) XXX-XXXX, Detective Serafin observed that both phone numbers had been in the same approximate locations regularly.  Id.  Detective Serafin attested that through electronic

---

[6]     This date appears to have been a typographical error.  Judge Moreno signed the search warrant for (952) XXX-XXXX on March 13, 2015.  See Gov't Ex. 4, p. 9.

surveillance, he learned that (612) XXX-XXXX had traveled to Chicago, Illinois within the last month, and the last known arrival to Chicago lasted approximately 4 days.  Id.

According to Detective Serafin, law enforcement officers observed Claybron exiting a residence in Maplewood, Minnesota.  Id.  Law enforcement also surveilled Claybron exiting a vehicle bearing Minnesota license plate 357XXX, which officers identified as a Nissan Juke.  Id.  Detective Serafin learned that Minnesota license plate 357XXX was a rental vehicle registered as a Nissan Juke and that Claybron was not the individual who originally rented the vehicle.  Id.  Detective Serafin attested that based upon his training and experience, he knew that individuals involved in narcotics trafficking often utilized rental vehicles, or vehicles not registered in their names, to avoid detection by law enforcement.  Id.

Detective Serafin was informed by the CI that Claybron was currently using a Nissan with Minnesota license place 357XXX to assist in the trafficking of controlled substances.  Id.  Detective Serafin verified through physical surveillance that the Nissan Juke observed by law enforcement and the Nissan identified by the CI were the same vehicle.  Id.

Detective Serafin attested that he knew from experience that those involved in narcotics distribution are skilled in counter-surveillance measure that allow them to identify law enforcement, avoid detection, and conceal the location of their illegal actions.  Id.  Thus, Detective Serafin believed it was necessary to install a mobile tracking device on the Nissan Juke in order to identify Claybron, his "stash" houses, sources, and meeting spots of others involved in the narcotics distribution organization. Id., p. 4.

On March 22, 2015, the Ramsey County District Court, Judge James Clark, issued an order authorizing the installation and use of electronic tracking on the Nissan Juke.  Id., pp. 6-7.  Based upon the supporting affidavit, Judge Clark found probable cause to believe that a crime had been or would be committed, and that evidence of narcotics trafficking would likely be discovered through electronic tracking of the Nissan Juke.  Id., p. 6.

**2.    Analysis**

The Court concludes that Detective Serafin's affidavit established probable cause for the use of electronic tracking on the Nissan Juke bearing Minnesota license plate 357XXX.  All of the information set forth above provided a substantial factual basis to conclude that Claybron was utilizing a Nissan Juke, Minnesota license plate 357XXX, to distribute narcotics between Chicago and Minnesota.  The affidavit explained how Detective Serafin acquired the information alleged, including the sources he relied upon, and a description of the information obtained during the course of the investigation.  As such, the affidavit was not conclusory.  Further, the affidavit established a sufficient connection between "Hood," Claybron, the Nissan Juke, and narcotics trafficking activity such that a reasonable person could conclude that evidence of drug trafficking would be found through electronic tracking of the Nissan Juke.  Also, the information provided by the CI was reliable because it was independently corroborated by Detective Serafin. See United States v. Dukes, 758 F.3d 932, 937 (8th Cir. 2014) ("'If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable.'") (citation omitted).

The CI had provided Detective Serafin with a physical description of Claybron. Detective Serafin examined a booking photo of Claybron and saw that he matched the physical description given by the CI. Detective Serafin also verified that the Nissan referenced by the CI was the same Nissan Juke law enforcement had observed Claybron driving.

Lastly, the CI had provided information leading to the arrest of persons engaged in narcotics trafficking in the past. Thus, even without independent corroboration, the issuing judge was entitled to infer that the CI was reliable, given the CI's track record of supplying truthful information to law enforcement.

For all of these reasons, the Court finds that Judge Clark had a substantial basis to conclude that evidence of narcotics trafficking would be found through electronic surveillance of the Nissan Juke, and therefore, Claybron's motion to suppress should be denied.

## II.    MOTIONS TO SUPPRESS THE SEARCH AND SEIZURE OF NISSAN JUKE

Claybron moved the Court for an order suppressing any evidence obtained as a result of a traffic stop of March 31, 2015, on the grounds that the stop, search and seizure of the vehicle Claybron was riding in was unlawful. Memorandum in Support of Pretrial Motions ("Claybron Mem."), pp. 2-4 [Docket No. 66]. According to Claybron, all evidence obtained from the Nissan Juke was tainted by the unlawful detention of Claybron, and therefore, the evidence must be suppressed as "fruits of the poisonous tree." Id., pp. 3-4 (citing Wong Sun v. United States , 371 U.S. 471, 491 (1963)).

The Government opposed Claybron's motion, first arguing that Claybron had no reasonable expectation of privacy in the Nissan Juke to give him standing to challenge

the search, as he was not authorized to use the vehicle.  Gov't Resp. I, pp. 4-5 (citing

Brendlin v. California, 551 U.S. 249, 254-55 (2007); United States v. Crippen, 627 F.3d

1056, 1063 (8th Cir. 2010); United States v. Barragan, 379 F.3d 524, 529-30 (8th Cir.

2004)); Post-Hearing Memorandum of the United States in Opposition to Defendants'

Motions to Suppress Evidence ("Gov't Resp. III"), pp. 3-4 [Docket No. 71] (citations

omitted).  Second, the Government contended that the Court need not decide whether

Claybron was unlawfully detained during the traffic stop because the drugs in the

vehicle would have been found regardless of whether Claybron was free to leave.  Gov't

Resp. III, pp. 4-5 (citing Segura v. United States, 468 U.S. 796, 805 (1984)).  Third, the

Government urged that Claybron was not unlawfully detained because the vehicle

Claybron was riding in was lawfully stopped, Claybron was not an authorized driver on

the vehicle's rental agreement, and Claybron could not have left the scene on his own,

as the stop occurred on a busy interstate freeway.  Id., pp. 5-6.  Fourth, the Government

maintained that Claybron was not handcuffed or restrained during the traffic stop, and

the amount of time that elapsed between the stop and the discovery of drugs was not

unreasonable under the circumstances.  Id., p. 6 (citing United States v. Riley, 684 F.3d

758, 762, 766 (8th Cir. 2012)).  Fifth, even if Claybron were detained, the Government

submitted that the detention was lawful because officers had reasonable suspicion of

criminal activity based upon an informant's tip that Claybron was transporting drugs.  Id.

(citing Adams v. Williams, 407 U.S. 143, 144-46; United States v. Morgan, 729 F.3d

1086, 1089 (8th Cir. 2013)).  Finally, the Government argued that Claybron cannot

object to the search of the vehicle or the amount of time it took because both Claybron

and the driver, Alexis Johnson, consented to the search.  Id., pp. 7-8.

A.    **Factual Background**

1.    **Officer Ben Henrich**

Officer Ben Henrich of the Minneapolis Police Department testified that on March 30, 2015, he was conducting electronic surveillance on a Nissan Juke and one of the phone numbers associated with Claybron. Tr. I at 24. Officer Henrich noticed that the Nissan Juke and the phone number were in the same location heading north from Chicago. Id. at 24-25. Officer Henrich had previously been informed by a confidential reliable informant that Claybron had travelled to Chicago to pick up heroin. Id. at 25. Officer Henrich and Task Force Officer Christopher Nybeck positioned themselves along Interstate 94 in Wisconsin to obtain physical surveillance of the Nissan Juke when it passed by. Id.

As Officer Henrich pulled onto Interstate 94 in Wisconsin, he observed the Nissan Juke pass him at high speed. Id. at 26. Officer Henrich radioed to other officers that he and Officer Nybeck were following the vehicle and that they were travelling "well above" the posted speed limit of 65 miles per hour.[7] Id. As officers continued surveillance of the Nissan Juke, they observed the vehicle commit additional traffic violations, such as following too close to other vehicles and changing lanes without signaling. Id. at 27. Trooper Schneider, who had been monitoring communications from other officers and was aware of the observed traffic violations, initiated a traffic stop of the Nissan Juke on Interstate 94 between Century and McKnight Road in Maplewood, Minnesota.[8] Id.

_____

[7]    Officer Henrich estimated that the Nissan Juke was traveling 75 to 80 miles per hour or more in a 65 mile-per-hour zone. Tr. I at 26.

[8]    The stop occurred between 8:30 and 9:00 a.m. Tr. I at 60.

Officer Henrich testified that after Trooper Schneider stopped the vehicle, he and other officers set up around the area to observe and provide backup if needed. Id. at 28. Trooper Schneider made contact with the driver of the Nissan Juke, who identified herself as Alexis Johnson. Id. Claybron was seated in the front passenger seat. Id. Claybron's two infant children were in the back seat. Id. at 28-29. Trooper Schneider determined that neither Johnson nor Claybron had a valid driver's license and that neither was the owner of the Nissan Juke.[9] Id. at 29. Claybron told Trooper Schneider that the vehicle was a rental; however, Claybron was unable to produce any rental paperwork. Id. Claybron informed Trooper Schneider that the Nissan Juke was owned by Enterprise Rent-A-Car. Gov't Ex. 9 at 8:32.

Approximately 15 minutes after the initial stop, Trooper Schneider contacted Enterprise and was informed that neither Johnson nor Claybron was authorized to drive the Nissan Juke, as neither was on the rental agreement. Tr. I at 29-30; Gov't Ex. 9 at 16:15. Enterprise also advised Trooper Schneider that the rental agreement had expired and that the vehicle was past due. Tr. I at 30. Enterprise instructed Trooper Schneider to tow the vehicle so that it could be returned to them. Id. Trooper Schneider informed Johnson that the Nissan Juke was going to be towed. Id. at 32; Gov't Ex. 9 at 18:49.

Officer Henrich testified that while Trooper Schneider was speaking with Enterprise, Trooper Thomas Erickson arrived at the scene. Tr. I at 30. Claybron told Trooper Erickson that he could search the Nissan Juke if he wanted to. Id. at 30; Gov't

---

[9]    Johnson asked to sit in Trooper Schneider's squad vehicle while he ran the initial license checks. Tr. I at 43; Gov't Ex. 9 (Trooper Schneider Squad Video of March 30, 2015 Traffic Stop of Claybron) at 4:05.

Ex. 10 (Trooper Erickson Squad Video of March 30, 2015 Traffic Stop of Claybron), at 14:50. Approximately 20 minutes after the initial stop, Trooper Schneider requested that Claybron sit in one of the squad vehicles. Gov't Ex. 9 at 21:01. Officer Henrich testified that Claybron was placed in the squad car because the traffic stop occurred on the side of the highway and it was not safe for him to wander freely outside of a vehicle. Tr. I at 60-61.

While Claybron was seated in Trooper Schneider's squad vehicle, Trooper Schneider asked Claybron whether he could search the Nissan Juke, and Claybron responded that he had already told Trooper Erickson that he could search the vehicle. Gov't Ex. 9 at 27:18. Trooper Schneider then conducted a canine sniff of the exterior of the Nissan Juke, but the canine did not alert to the presence of any illegal drugs. Tr. I at 31-32. Following the canine sniff, officers performed an inventory search of the vehicle, which revealed no drugs.[10] Id. at 32.

Officer Henrich testified that Johnson asked Trooper Schneider to retrieve some money from a cup holder in the center console of the Nissan Juke. Id. at 32; Gov't Ex. 9 at 42:30, 48:06. Trooper Schneider looked inside the vehicle and saw that the money was jammed in the cup holder with various other items. Tr. I at 32. Officer Henrich testified that when Trooper Schneider grabbed the money, the entire cup holder came out; underneath the cup holder was a package of narcotics in plain view. Id. According to Officer Henrich, the package contained 64 grams of cocaine and 68 grams of heroin.

---

[10] Officer Henrich testified that the Minnesota State Patrol is required to perform an inventory search of a vehicle prior to towing. Tr. I at 30. Officer Henrich explained that an inventory search involves searching the trunk, glove box, and anything lying around the seats. Id. at 50. However, officers cannot search under the dashboard, behind the radio or glove box, or anywhere else that would necessitate manipulating the structure of the vehicle. Id.

Id. at 33.   Officer Henrich testified that these amounts were consistent with drug distribution. Id. Claybron was arrested. Id. at 32.

Had the drugs not been discovered in the Nissan Juke, Officer Henrich testified that law enforcement would have made arrangements to have Claybron and Johnson transported to their original destination, the Nissan Juke would have been towed, and officers would have applied for a search warrant of the vehicle or conducted another canine sniff in a controlled environment away from wind and passing vehicles. Id. at 62-63.

### 2.     Trooper Thomas Erickson

Trooper Thomas Erickson of the Minnesota State Patrol testified that on March 30, 2015, he was involved in the traffic stop of the Nissan Juke on Interstate 94 at McKnight Road. Transcript of Motions Hearing held on July 9, 2015 ("Tr. II") at 13 [Docket No. 61]. Trooper Erickson arrived approximately two minutes after Trooper Schneider initiated the stop. Id.

Trooper Erickson testified that while Trooper Schneider was doing something in his squad vehicle, Claybron exited the Nissan Juke on his own. Id. at 14. According to Trooper Erickson, it was very unusual for someone to exit the vehicle during a traffic stop.[11] Id. Consequently, Trooper Erickson conducted an exterior pat-down search of Claybron but found no weapons. Id. at 14-15. Trooper Erickson struck up a casual conversation with Claybron concerning Claybron's trip to Chicago and his two infant children. Id. At some point during this conversation, Claybron gave Trooper Erickson permission to search the whole vehicle. Id. at 15-16. Trooper Erickson testified that he

---

[11]   Claybron explained that he had gotten out of the vehicle to smoke a cigarette. Tr. II at 15.

never raised the subject of searching and never made any promises or threats to induce Claybron's consent.  Id. at 16.

Approximately 30 minutes after the initial stop, officers began an inventory search of the Nissan Juke.  Id. at 17.  At that time, officers asked Claybron to sit in Trooper Kloss's squad vehicle.[12]  Id. at 18.  According to Trooper Erickson, Claybron never requested to leave the squad car.  Id.

Following Trooper Schneider's communications with Enterprise, Claybron was informed that the Nissan Juke was going to be towed and impounded because the rental period had expired.  Id.  Trooper Schneider had a discussion with Claybron as to how officers would get Claybron and his children where they needed to go.  Id. at 18-19.  Trooper Erickson stated that it would not have been feasible for Claybron to leave the scene on his own, as it was illegal and unsafe for a person to walk along the freeway.  Id. at 19.

### B.     Analysis

#### 1.     Standing to Challenge Search

"Fourth Amendment rights are personal and cannot be asserted vicariously." United States v. Pierson, 219 F.3d 803, 806 (8th Cir. 2000) (citing United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)).  "[I]t is undisputed 'that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.'"  United States v. Maxwell, 778 F.3d 719, 732 (8th Cir. 2015) (citations omitted).

---

[12]     Trooper Kloss was the third officer on the scene.  Id. at 18.

"Because Fourth Amendment rights are personal and may not be asserted vicariously, we must first determine whether [the defendant] had a legitimate expectation of privacy in the area searched or the item seized." Gomez, 16 F.3d at 256 (citing Rakas v. Illinois, 439 U.S. 128, 138-44 (1978); United States v. Morales, 737 F.2d 761, 763 (8th Cir. 1984)); see also Pierson, 219 F.3d at 806 ("A defendant moving to suppress evidence has the burden of showing a legitimate expectation of privacy in the area searched.") (citation omitted).  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." United States v. Barragan, 379 F.3d 524, 529-30 (8th Cir. 2004) (citing Gomez, 16 F.3d at 256).

Factors relevant to the determination of standing include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

United States v. Anguiano, 2015 WL 4604960, at *4 (8th Cir. Aug. 3, 2015) (citing Gomez, 16 F.3d at 256); Pierson, 219 F.3d at 806 (same) (citation omitted).

The Court finds that Claybron does not have standing to assert a Fourth Amendment claim with regard to the search of the Nissan Juke.  To challenge the search of a rental vehicle, he "must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995) (citations omitted); cf. United States v. Best, 135 F.3d 1223, 1225 (8th Cir. 1998) ("Trooper Byrd testified that Best had stated that Susan Thomas had rented the car for

him. . . . If Thomas had granted Best permission to use the automobile, Best would have a privacy interest giving rise to standing."). Here, Claybron "was not an owner, registered user, or driver of the vehicle when it was stopped; rather, he was merely a passenger. Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'" Anguiano, 2015 WL 4604960, at *4 (quoting Rakas, 439 U.S. at 148).[13]   To the contrary, Enterprise instructed Trooper Schneider to tow and impound the Nissan Juke so it could be returned to them. Thus, because Claybron did not have consent or permission to operate the Nissan Juke, he had no reasonable expectation of privacy in the vehicle. Accordingly, Claybron lacks standing to challenge the search.

---

[13]   Although historical use is a relevant factor in determining whether a defendant had a reasonable expectation of privacy in vehicle, the defendant still must demonstrate that his "subjective expectation is one that society is prepared to recognize as objectively reasonable." Muhammad, 58 F.3d at 355. In this case, even though Claybron had been using the Nissan Juke for some time, there is no evidence that he ever had permission to do so. A subjective expectation of privacy in a misappropriated rental vehicle is not one that society would recognize as reasonable. See Anguiano, 2015 WL 4604960, at *4 ("[E]ven if Anguiano had driven the vehicle himself at some point, he provided no evidence of consent or permission from the vehicle's lawful owner.") (citing Muhammad, 58 F.3d at 354 (holding defendant needed to make some affirmative showing of consensual possession to satisfy the standing requirements)). In any event, even if Claybron had been the authorized renter, which he was not, the expiration of the rental period, coupled with Enterprise's request that the car be towed so it could be returned to it, eliminated any reasonable expectation of privacy in the vehicle. See United States v. Lumpkins, 2011 WL 3320530, at *7 (W.D. Mo. July 6, 2011) (citations omitted), aff'd, 687 F.3d 1011 (8th Cir. 2012); cf. United States v. Bohmont, 413 F. App'x 946, 951 (8th Cir. 2011) ("Under our precedent, once an individual is lawfully ejected from a hotel, the rental period terminates and 'control over the hotel room revert[s] to the management.' Thus, at the time the officers forcibly entered the hotel room at [the security guard's] request, [defendant] had no reasonable expectation of privacy in the hotel room, and the subsequent search of the room did not violate his Fourth Amendment rights.") (citations omitted).

### 2.    Consent to Search

Even if Claybron had standing to challenge the search, the Court finds that no constitutional violation took place with respect to the search and seizure of the drugs because both he and Johnson, the driver, consented to the search of the Nissan Juke.

"'Under the fourth and fourteenth amendments, searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions.'" United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005) (quoting United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004)). "Consent to search is one exception to the warrant requirement, and '[a] warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search.'" United States v. Farnell, 701 F.3d 256, 262-63 (8th Cir. 2012) (citation omitted). "'An individual may validly consent to an otherwise impermissible search if, in the totality of the circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion.'" Id. at 263 (quoting United States v. Castellanos, 518 F.3d 965, 969 (8th Cir. 2008)).

In this case, the warrantless search of the vehicle was valid because it was conducted pursuant to Claybron's knowing and voluntary consent, as well as by Johnson's consent.  Within the first 15 minutes of the traffic stop, Claybron told both Trooper Schneider and Trooper Erickson that they could search the Nissan Juke if they wanted to do so.  This consent was given voluntarily, as Trooper Erickson never raised the subject of searching the car and never made any threats or promises to induce Claybron's consent.  Rather, Claybron spontaneously gave his permission to search the vehicle during a casual conversation with Trooper Erickson, and then in response to a

request to search by Trooper Schneider.  Further, while the initial search of the vehicle did not lead to the discovery of the drugs, the subsequent request by Johnson (the driver of the car) that officers retrieve her money from the cup holder under which the cocaine and heroin were ultimately discovered, constituted permission by her, and was consistent with the consent that Claybron had previously given to both Troopers Schneider and Erickson.  Accordingly, under the totality of the circumstances, the Court finds that Claybron freely consented to the search of the Nissan Juke, and therefore, his motion to suppress should be denied.

### 3.    Whether Claybron was Unlawfully Detained

Notwithstanding this Court's conclusion that Claybron's motion to suppress must be denied because he has no standing to contest the search and seizure of the drugs found in the Nissan Juke, the Court addresses Claybron's argument that his continued detention by law enforcement during the traffic stop was unlawful, and therefore, all evidence obtained from the vehicle must be suppressed as "fruits of the poisonous tree."  Claybron Mem., pp. 3-4.  Claybron's argument is premised on the proposition that while he "lacks an interest in the vehicle, 'he may still contest the lawfulness of his own detention and seek to suppress evidence as the fruit of his illegal detention.'"  United States v. Green, 442 F.3d 677, 680 (8th Cir. 2006) (citation omitted).

Claybron's continued detention argument as a basis for suppression of the drugs fails.  First, Claybron has not challenged the initial stop of the Nissan Juke, nor could he.  "Even a minor traffic violation provides probable cause for a traffic stop."  United States v. Harris, 617 F.3d 977, 979 (8th Cir. 2010) (citation omitted).  Here, law enforcement officers witnessed the Nissan Juke commit multiple traffic violations such

as speeding, changing lanes without signaling, and following too close to other vehicles. These traffic violations provided Trooper Schneider with probable cause to stop the Nissan Juke, and therefore, Claybron was not illegally detained as a result of the initial stop.

Second, Claybron was not illegally detained at the time Trooper Schneider learned that Claybron was not authorized to drive the Nissan Juke.  Even though the vehicle was stopped for a minor traffic violation, Trooper Schneider quickly discovered that neither Claybron nor Johnson had a valid driver's license, and Claybron was unable to produce any rental paperwork.  These circumstances provided Trooper Schneider with reasonable suspicion to extend the stop in order to further investigate the status of the Nissan Juke.  See Anguiano, 2015 WL 4604960, at *3 ("There is no per se time limit on all traffic stops, and complications in carrying out the traffic-related purposes of the stop may justify a longer detention than when a stop is strictly routine.  Furthermore, if the investigating officer discovers information leading to reasonable suspicion, he may justifiably extend the stop.") (citations omitted).  Thus, when Trooper Schneider contacted Enterprise and learned that Claybron and Johnson were not on the rental agreement, no Fourth Amendment violation had occurred.

Because Claybron was not illegally detained when Trooper Schneider discovered that neither Claybron nor Johnson was the authorized renter of the Nissan Juke, the Court need not determine whether Claybron's continued detention beyond that point was unlawful.  However, even if the Court assumes, without deciding, that the seizure of Claybron was illegally extended following Trooper Schneider's communication with

Enterprise, Claybron has failed to establish a factual nexus between any unlawful detention and the discovery of drugs in the Nissan Juke.

"[T]he exclusionary rule is inapplicable when the connection between the constitutional violation and the evidence to be excluded is 'so attenuated as to dissipate the taint.'" United States v. Swope, 542 F.3d 609, 613 (8th Cir. 2008) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)); see also United States v. Smith, 715 F.3d 1110, 1115-16 (8th Cir. 2013) ("A mere causal connection between information gathered during an illegal search and evidence prepared for trial does not require automatic exclusion of evidence. 'Such connection may have become so attenuated as to dissipate the taint.'") (quoting United States v. Watson, 950 F.2d 505, 507 (8th Cir. 1991)); United States v. Faulkner, 636 F.3d 1009, 1015 (8th Cir. 2011) ("We have previously explained that evidence obtained as the result of an unjustified search or arrest may be admissible if the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality.") (internal quotation marks omitted) (quoting United States v. Simpson, 439 F.3d 490, 495 (8th Cir.2006)).  In other words, illegally obtained evidence "should only be excluded if the 'illegality is at least a but-for cause of obtaining the evidence.'"  United States v. Riesselman, 646 F.3d 1072, 1079 (8th Cir. 2011); see also United States v. Hastings, 685 F.3d 724, 728 (8th Cir. 2012) (same).

Further, "[u]nder the independent source doctrine, the exclusionary rule is inapplicable where the evidence was acquired through a source independent of the tainted search."  United States v. Brooks, 715 F.3d 1069, 1075 (8th Cir. 2013) (citing Swope, 542 F.3d at 613).

"In order to determine whether challenged evidence is the fruit of an illegal search or seizure, 'the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence.'" Riesselman, 646 F.3d at 1079 (quoting United States v. Marasco, 487 F.3d 543, 547 (8th Cir. 2007). "Once the defendant comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government." Id. (citing Alderman v. United States, 394 U.S. 165, 183 (1969)).

Here, the discovery of the cocaine and heroin in the Nissan Juke did not result from Claybron's prolonged detention; it resulted from Johnson's independent request that officers retrieve her money from the cup holder.  Stated otherwise, Johnson's voluntary request to get her money out of the cup holder provided a basis for the search that was independent of whether the officers' detention of Claybron comported with the Fourth Amendment.  Cf. Green, 442 F.3d at 680 ("Regardless of whether the initial stop of the vehicle was lawful, Folino's consent 'provided a basis for [the search] that was independent of whether the officers' stop of the vehicle comported with the fourth amendment.'") (quoting United States v. Kreisel, 210 F.3d 868, 869 (8th Cir.2000)). Because Claybron "did not have a legitimate expectation of privacy" in the Nissan, much less in its cup holder, Johnson's "consent was sufficient to purge the taint of any alleged Fourth Amendment violation." Green, 442 F.3d at 681 (citing Rakas, 439 U.S. at 148–49).

In addition, illegally obtained evidence should not be suppressed "'[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" United States v.

McManaman, 673 F.3d 841, 846 (8th Cir. 2012) (quoting Wong Sun, 371 U.S. at 488). The inevitable discovery exception applies "when the government proves 'by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.'"  Id. (citations omitted); see also United States v. Munoz, 590 F.3d 916, 923 (8th Cir. 2010) (same) (citations omitted).

In this case, within the first 15 minutes of the traffic stop, Trooper Schneider was advised by Enterprise that neither Claybron nor Johnson was authorized to drive the Nissan Juke, and that the rental period had expired.  At that moment, even if Claybron had been free to leave the scene, the Nissan Juke would have remained in the possession of law enforcement officers.  Further, Officer Henrich testified that if no drugs had been found at the scene of the traffic stop, law enforcement would have applied for a search warrant of the Nissan Juke or conducted another canine sniff in a controlled environment away from wind, odors and passing vehicles.  Tr. I at 62.  All of these circumstances demonstrate a reasonable probability that officers would have eventually searched the Nissan Juke and discovered the narcotics, whether through a canine sniff, another inventory search, or a search warrant.  As such, the "inevitable discovery" of the drugs was sufficient to purge the taint of any unlawful detention of Claybron during the traffic stop.

For all of these reasons, Claybron's motion to suppress evidence obtained from the Nissan Juke should be denied.

III.   **MOTIONS TO SUPPRESS SEARCH OF XXXX DESOTO STREET AND XXXX EAST 10TH ST**

Moore and Claybron have both moved the Court for an order suppressing all physical evidence seized during the execution of a search warrant at XXXX Desoto Street, Maplewood, Minnesota ("Desoto Street Residence") on March 30, 2015, on the grounds that the warrant was issued without a sufficient showing of probable cause in the supporting affidavit.   [Docket Nos. 33, 46].   In addition, Claybron has filed a motion to suppress any evidence obtained during the execution of a search warrant at XXXX East 10th Street, Apt. XXXX ("10th Street Residence"), on the grounds that the warrant was not supported by probable cause.   [Docket No. 47].

At the hearing on June 25, 2015, the parties agreed that these motions could be resolved based on the four corners of the warrants and supporting affidavits.   Tr. I at 17-20.

A.   **Factual Background**

On March 30, 2015, Detective Serafin submitted an application and supporting affidavit for a warrant to search the Desoto Street Residence and 10th Street Residence, including any garages, outbuildings, storage sheds, persons currently occupying the residence, and any vehicles associated with the residences or persons found within.   Gov't Ex. 1, pp. 1-6; Gov't Ex. 6, pp. 1-6.[14]   Detective Serafin attested that the Desoto and 10th Street residences would contain evidence of controlled substances including packaging equipment, documents, electronic devices, monies, and firearms.   Gov't Ex. 1, p. 1; Gov't Ex. 6, p. 1.

---

[14]   The pages of Government Exhibit 1 and 6 were not numbered.   For the convenience of citing, the Court has numbered them.

In support of his applications, Detective Serafin provided the following information:[15]

Detective Serafin attested that he had been conducting an ongoing felony investigation of Claybron for distribution of controlled substances.  Gov't Ex. 1, p. 2; Gov't Ex. 6, p. 2.  Detective Serafin had received information from a CI that a person known as "Hood" was trafficking controlled substances for the past two years in Minnesota.  Id.  This CI had provided Detective Serafin with names, phone numbers, and addresses of individuals involved in narcotics trafficking in the past, which had led to the arrest of those individuals involved in narcotics trafficking.  Id.

Detective Serafin had learned from the CI that "Hood" had been involved in heroin trafficking in Minnesota for the past two years.  Id.  The CI described "Hood" as a dark-skinned black male with a short and stocky build.  Id.  The CI also informed Detective Serafin that he believed "Hood" was a member of the criminal street gang known as the Gangster Disciples, and that "Hood" worked with other unknown individuals in the distribution of Heroin in the Saint Paul-Minneapolis area.  Id.

According to Detective Serafin, the CI had identified a phone number used by "Hood" as (612) XXX-XXXX.  Id.  On March 3, 2015, Detective Serafin obtained a search warrant for (612) XXX-XXXX from Judge Quam of the Hennepin County District Court.  Id.

Detective Serafin learned from the CI that "Hood" utilized multiple cellular phones in furtherance of narcotics trafficking.  Id.  Detective Serafin also learned that "Hood" was currently using the cell phone number (952) XXX-XXXX to conduct narcotics

---

[15]     The information provided in both supporting affidavits is identical.

trafficking.   Id.   Judge Moreno of the Hennepin County District Court reviewed and signed a search warrant for (952) XXX-XXXX on March 13, 2015.   Id.

Detective Serafin attested that the CI had identified "Hood" as Jason Claybron. Id.   Detective Serafin was shown a photo of Claybron, and Detective Serafin verified Claybron's identity with a Hennepin County booking photo taken in 2015.   Id.   Detective Serafin learned through the booking photo that Claybron was a black male, approximately 5'4" tall and weighing about 161 pounds.   Id.

Through electronic surveillance of phone numbers (612) XXX-XXXX and (952) XXX-XXXX, Detective Serafin observed that both phone numbers had been in the same approximate locations regularly.   Gov't Ex. 1, p. 2-3; Gov't Ex. 6, pp. 2-3.   Detective Serafin attested that through electronic surveillance, he learned that (612) XXX-XXXX had traveled to Chicago, Illinois within the last month, and the last known arrival to Chicago lasted approximately 4 days.   Gov't Ex. 1, p. 3; Gov't Ex. 6, pp. 3.

Detective Serafin learned through electronic surveillance that both phone numbers were in the area of the 10th Street Residence.   Id.   The CI also informed Detective Serafin that Claybron was living at the 10th Street Residence, Apartment #506.   Id.   Detective Serafin observed a vehicle with Minnesota license plate 357XXX parked in the parking lot of the 10th Street Residence.   Id.   Through electronic surveillance, Detective Serafin saw that the vehicle and both phone numbers consistently arrived at the 10th Street Residence in the late evening and early morning hours for an extended period of time.   Id.

Within the past month, Detective Serafin monitored phone number (612) XXX-XXXX and found that it had traveled to Chicago and returned approximately three days

later, driving directly to the area of the 10th Street Residence.  Id.  Detective Serafin attested that this was consistent with information provided by the CI.  Id.

On March 24, 2015, Detective Serafin observed Claybron exiting and entering the Desoto Street Residence using a key on four occasions.  Id.  Detective Serafin further witnessed Claybron take mail out of the mailbox at the residence, which was next to the front door.  Id.

Through physical surveillance, Detective Serafin observed Claybron entering and exiting the driver's seat of a Nissan Juke, Minnesota license plate 357XXX.  Id.

Detective Serafin believed that the Desoto Street and 10th Street Residences were utilized by Claybron as "stash" houses, sources and meeting spots for persons engaged in an ongoing criminal heroin distribution organization.  Id.  Based upon his training and experience, Detective Serafin knew that narcotics dealers and traffickers tended to conceal their true residence and stay at multiple locations to remain undetected by law enforcement.  Id.  Detective Serafin learned through electronic and physical surveillance that Claybron frequented the Desoto and 10th Street Residences multiple times a day and stayed at both locations, consistent with a permanent residence.  Id.

Detective Serafin attested that he had learned that Minnesota license 357XXX was a rental vehicle, registered to a Nissan Juke.  Id.  Detective Serafin attested that Claybron was not the person who originally rented this vehicle.  Id.  Through his training and experience, Detective Serafin knew that individuals involved in drug trafficking often utilize rental vehicles to avoid law enforcement detection.  Id.

The CI informed Detective Serafin that Claybron was using a Nissan bearing Minnesota license plate 357XXX to assist with drug trafficking.  Gov't Ex. 1, p. 4; Gov't Ex. 4, p. 4.   Detective Serafin verified that the Nissan Juke observed by law enforcement and the Nissan identified by the CI were the same vehicle.  Id.

Detective Serafin knew from experience that those involved in narcotics distribution are skilled in counter-surveillance measures that allow them to identify law enforcement, avoid detection, and conceal the location of their illegal actions.  Id.

Detective Serafin attested that on March 22, 2015, he obtained a tracker search warrant for the Nissan Juke, Minnesota license 357XXX.  Id.

On March 25, 2015, Detective Serafin observed through electronic surveillance that Minnesota license 357XXX and phone number (612) XXX-XXXX left Minnesota heading east on Interstate 94 through Wisconsin towards Chicago, Illinois.   Id. Wisconsin State Patrol dispatch informed Detective Serafin that on March 26, 2015, Minnesota license 357XXX was stopped for speeding at 1:48 a.m.  Id.  The trooper identified the driver as Claybron, with his two infants in the vehicle.  Id.

On March 27, 2015, at approximately 1:43 p.m. and 2:18 p.m., Detective Serafin observed through electronic surveillance that phone number (952) XXX-XXXX was in the area of the Desoto Street Residence in Maplewood, Minnesota.  Id.  At approximately 2:30 p.m., Detective Serafin observed two unknown males exit the Desoto Street Residence and get into a vehicle, Minnesota License 563XXX.  Id.  The registered owner of this vehicle, Amanda Hobbs, was listed as living at the Desoto

Street Residence.[16]   Id.   At 2:36 p.m., Detective Serafin observed through electronic surveillance that (952) XXX-XXXX was in the area of Larpenteur Avenue East and McMenemy Street in Maplewood, Minnesota, consistent with the time that Minnesota license 563XXX had left the area.   Id.

Detective Serafin attested that on March 30, 2015, at 9:12 a.m., the Minnesota State Patrol stopped Minnesota license 357XXX for traffic violations on Interstate 94 near McKnight Road in Ramsey County.   Id.   Officers identified the driver as Alexis Johnson, who had a suspended driver's license.   Id.   Claybron was riding in the vehicle along with two infants in the back seat.   Id.   Detective Serafin observed that phone number (612) XXX-XXXX was in the location of the stop between 9:13 and 9:34 a.m. Id.   Detective Serafin attested that troopers were unable to locate any rental paperwork in the vehicle.   Id.   Troopers contacted Enterprise Rent-A-Car, which advised that neither Claybron nor Johnson was on the rental agreement, and that the vehicle should be impounded for safekeeping.   Id.   During an inventory search of the vehicle, Johnson asked Trooper Schneider to recover her $40 from the cup holder.   Id.   While Trooper Schneider was collecting the $40, he found a large quantity of a substance which field-tested positive for heroin.   Id.   Trooper Schneider placed Johnson and Claybron under arrest.   Id.   After Claybron was arrested, he told law enforcement that he lived at the 10th Street Residence with his auntie "YOYO."   Id.

On March 30, 2015, the Ramsey County District Court, Judge Margaret Marrinan, signed an order authorizing search of the Desoto Street Residence, "to

---

[16]    The affidavit did not identify the make of the vehicle.  However, it was not the BMW observed by law enforcement on March 30, 2015, in the vicinity of the Desoto Street Residence, as that car was listed to a Darryl Bell, who had no association with the Desoto Street Residence.  Tr. 113-14.

include but limited to any garages, outbuildings, storage sheds associated with the address.  Any person(s) currently occupying the residence.  Any vehicles associated with the residences or the person(s) found within."  Gov't Ex. 1, p. 7.  Likewise, Judge Marrinan signed an order authorizing search of the 10th Street Residence, "to include but limited to any garages, outbuildings, storage sheds associated with the apartment, any persons currently occupying the apartment, and any vehicles associated with the apartment or the persons found within."  Gov't Ex. 6, p. 7.  Judge Marrinan found probable cause to believe that evidence of controlled substances would be discovered at the Residences.  Id.

> **B.    Analysis**

The Court finds that Detective Serafin's supporting affidavits provided probable cause to search the Desoto Street and 10th Street Residences.  The affidavits set forth a substantial factual basis for concluding that Claybron was using both premises in connection with drug trafficking activity.

A reliable CI had informed Detective Serafin that Claybron was trafficking heroin in Minnesota using a Nissan with Minnesota license 357XXX.  The CI also advised that Claybron was living at the 10th Street Residence and was using phone number (612) XXX-XXXX.  While conducting physical surveillance, Detective Serafin observed a Nissan Juke, Minnesota license 357XXX, parked at the 10th Street Residence.  Detective Serafin witnessed Claybron getting in and out of the driver's seat of the Nissan Juke.  On March 24, 2015, Detective Serafin also observed Claybron entering and leaving the Desoto Street Residence using a key on four occasions.  Through electronic surveillance, Detective Serafin saw that phone numbers (612) XXX-XXXX

and (952) XXX-XXXX were frequently in the same location.   On March 25, 2015,
Detective Serafin observed phone number (612) XXX-XXXX and Minnesota license
357XXX leaving Minnesota and heading towards Chicago.   The driver was later
identified by Wisconsin State Patrol as Claybron.  On March 27, 2015, Detective Serafin
saw that phone number (952) XXX-XXXX was in the area of the Desoto Street
Residence.  On March 30, 2015, Minnesota State Troopers stopped the Nissan Juke for
traffic violations and found heroin in the vehicle.   Law enforcement learned that
Claybron was not an authorized renter of the Nissan Juke.  Detective Serafin attested
that through his training and experience, he knew that drug traffickers drove vehicles
rented in other persons' names to avoid detection by law enforcement.   Detective
Serafin also knew that drug traffickers utilized multiple residences to conceal their illegal
activities.

　　　　All of this information provided a substantial factual basis for Judge Marrinan to
find probable cause to search the Desoto Street and 10th Street Residences.  The
affidavit drew a sufficient connection between Claybron, narcotics trafficking activity,
and the Desoto Street and 10th Street Residences such that a reasonable person could
conclude that evidence of drug trafficking would be found at both locations.  Further, the
information in the affidavit was not conclusory, as Detective Serafin set forth the steps
he took in investigating Claybron, including the information obtained through physical
and electronic surveillance, as well as the information provided by the CI, who had
provided reliable information in the past.

　　　　For all of these reasons, the Court concludes that Judge Marrinan had a
substantial basis to conclude that evidence of drug trafficking would be found at the

Desoto Street and 10th Street Residences.  Defendants' motions to suppress should be denied.

## IV.   MOORE'S MOTION TO SUPPRESS STATMENTS

Moore filed a motion to suppress any confessions, admissions or statements made by him on March 30, 2015, in connection with the execution of a search warrant at the Desoto Street Residence, on the grounds that the statements were the product of Moore's illegal seizure, the statements were involuntarily given because they were the result of threats to arrest and charge Moore's pregnant girlfriend, and the statements were tainted by Moore's initial non-Mirandized statement.  [Docket No. 32].

### A.   Factual Background

#### 1.   Detective Erik Husevold

Detective Erik Husevold of the Hopkins Police Department testified that on March 30, 2015, he participated in the execution of a search warrant at the Desoto Street Residence.  Tr. I at 68.   Prior to the entry team making their initial entrance to the Residence, Detective Husevold was conducting surveillance of the building from across the street.  Id. at 68-69.  At that time, law enforcement did not know who resided at the Desoto Street Residence.  Id. at 74.  As he was conducting surveillance, Detective Husevold saw a black male and white female exit the Residence.[17]  Id. at 69, 71.  These individuals were later identified as Moore and Amanda Hobbs.  Id. at 69.   Neither Detective Husevold nor Detective Serafin knew the identity of the black male or white

---

[17]   Detective Husevold described the Desoto Street Residence as a "townhome that's connected with several other townhomes in one big building."  Tr. I at 69.  Each unit had its own entrance and exit.  Id.

female prior to their seizure.[18]  Id. at 73.  As Moore and Hobbs exited the Residence, they entered a black BMW parked in front of the building.  Id. at 69.  The BMW did not drive away.  Instead, it remained parked and it appeared it was turned on because its headlights were activated.  Id. at 70.  Detective Husevold subsequently testified that the BMW was parked up the street to the north of the Desoto Street Residence, but he could not recall how far.  Id. at 74.  Later, he stated that the stop of the BMW occurred on the street, outside the curtilage of the Residence.  Id. at 77.  Detective Huseveld had no information regarding who resided at the Desoto Street Residence or the BMW when he was conducting surveillance.  Id. at 74, 75.

Detective Husevold radioed his observations to other officers in the area.  Id. at 69-70.  This all took place before officers went into the Desoto Street Residence.  Id. at 70.  Officers then moved in to detain Moore.  Id.  A police squad car hit the BMW from behind.  Id. at 75.  Then officers exited their vehicles behind the BMW with weapons drawn.  Id. at 76-77.  Moore and Hobbs were ordered out of the BMW and placed in handcuffs.  Id. at 77.  Detective Husevold testified that the entry team entered the Residence "a matter of seconds" after Moore and Hobbs were detained.  Id. at 70.

### 2.   Task Force Officer Christopher Nybeck

Officer Nybeck of the Hennepin County Sheriff's Office testified that he was present during the execution of the search warrant at the Desoto Street Residence, which took place later morning or early afternoon.  Id. at 82.  Officer Nybeck arrived 30

---

[18]     Detective Husevold testified that Detective Serafin had conducted surveillance outside the Desoto Street Residence six days prior to the execution of the search warrant.  Tr. I at 77-78.  At that time, Deputy Serafin saw two black makes exit the Residence, and he identified one as Claybron.  Id. at 78.  After Moore was taken into custody on March 30, 2015, Detective Serafin was able to identify the second black male from March 24, 2015, as Moore.  Id.

seconds to a minute after officers had detained Moore and made the initial entry into the Residence.  Id.  Prior to the execution of the search warrant, law enforcement officers were not aware that either Moore or Hobbs was associated with the Desoto Street Residence, and no one knew who Moore was.  Id. at 112.  In addition, officers had no information that the black BMW had any relation to Moore prior to the execution of the warrant or any connection the Desoto Street Residence.  Id. at 112-13, 124.  Officer Nybeck testified that the BMW was listed to a Darryl Bell, who was not associated with the Desoto Street Residence.  Id. at 113-14.

Upon arriving at the Residence, Officer Nybeck went to speak with Moore who was in the front yard of the Residence.  Id. at 82-83.  At that time, Officer Nybeck had no information regarding Moore.  Id. at 124.  Officer Nybeck saw that Moore was in handcuffs and was being supervised by Agent Hage.  Id. at 83, 114, 115.  Officer Nybeck asked Moore if there was anything dangerous in the house that he needed to know about, such as animals or weapons.  Id. at 83.  Officer Nybeck testified that he asked these questions for his safety and the safety of other officers.  Id.  Moore stated that a gun was located between the cushions of a couch or chair in the living room.  Id.  Officer Nybeck asked Moore if there was anything else he needed to know about, and Moore responded that there were narcotics in a black backpack upstairs.  Id. at 83-84.  At that point, Officer Nybeck ceased questioning.  Id. at 84.  Officer Nybeck testified that he had not given Moore a Miranda warning prior to questioning.  Id. Officer Nybeck later learned that Agent Hage had previously questioned Moore, without a Miranda warning, with regard to guns and drugs in the Residence.  Id. at 115-16.  Officer Nybeck stated

that he relayed the information provided by Moore to the entry team while they were in the process of securing the Residence.  Id. at 119.

During the search of the Desoto Street Residence, officers discovered a loaded gun and a black backpack containing heroin, just as Moore had described.  Id. at 85-86. Officers also found a bulletproof vest.  Id. at 86. Also during the search, officers found documentation showing that Moore and Hobbs lived at the Residence.  Id. at 117.

While officers continued to search the Residence, Officer Nybeck and Detective Serafin conducted a tape-recorded interview of Moore in the bathroom on the ground level of the Residence.  Id. at 86-87.  Officer Nybeck estimated that the interview took place five to ten minutes after he had arrived at the Residence.  Id. at 87.  Prior to the interview, Officer Nybeck read Moore his Miranda rights.  Id. at 87; Gov't Ex. 2 (Tape-Recorded Interview of Claybron of March 30, 2015), at 00:55.  Officer Nybeck asked Moore if he understood his rights, and Moore stated that he did.  Tr. I at 87; Gov't Ex. 2 at 1:07.  Officer Nybeck then asked Moore if he could ask him some quick questions, and Moore agreed to answer.  Tr. I at 87.  During the interview, Moore made admissions regarding the narcotics, gun and bulletproof vest found in the Residence. Tr. I at 88.

According to Officer Nybeck, the interview lasted for approximately 30 to 45 minutes.  Id.  During the interview, Moore never asked for a lawyer and never requested to terminate questioning.  Id.  Moore appeared clear minded and was able to understand Officer Nybeck's questions.  Id. at 88-89.  Officer Nybeck testified that he did not threaten or make any promises to induce Moore to answer his questions.  Id. at 89.  Officer Nybeck denied ever threatening to arrest or charge Moore's pregnant

girlfriend.  Id.  In fact, during the interview, officers informed Moore that they were not going to arrest his girlfriend.  Gov't Ex. 2 at 13:30.

After the interview was completed, but while officers were still searching the Residence, Officer Nybeck was informed that a large amount of United States currency had been found.  Tr. I at 89.  Officer Nybeck went back on tape and asked Moore about the money.  Id. at 89-90.  During this portion of the interview, Moore did not ask to stop the interview and did not request the presence of a lawyer.  Id. at 90.  Officer Nybeck testified that no threats or promises were made to Moore, and there was no mention of arresting Moore's girlfriend.  Id.

## B.   Analysis

In support of his motion, Moore argued that his seizure was beyond the scope of the search warrant because he did not reside at the Desoto Street Residence and was outside the curtilage of the Residence at the time he was stopped.  Defendant Moore's Memorandum in Support of Pretrial Motions ("Moore Mem."), pp. 4-5 [Docket No. 65] (citing Bailey v. United States, 133 S. Ct. 1031 (2013)).  Moore disagreed with the Government's contention that the search warrant specifically authorized the search of Moore's person, as Moore was not found within the premises of the Desoto Street Residence, the vehicle he was driving was not associated with the Residence, and his name did not appear in the warrant's description of people to be searched or in the affidavit in support of the search warrant.  Id., p. 6 (citing Tr. I at 113-14).  In addition, Moore submitted that his statements to Agent Hage and Officer Nybeck must be suppressed because they were given in the absence of a Miranda warning, even though Moore was in custody.  Id., pp. 7-8.  Lastly, Moore contended that his Mirandized tape-

46

recorded statement given five to ten minutes after the initial questioning by Agent Hage and Officer Nybeck must be suppressed because it was tainted by his prior non-Mirandized confessions.  Id., pp. 8-9 (citing Missouri v. Seibert, 542 U.S. 600 (2004)).

The Government represented that it did not intend to use any of Moore's pre-Miranda statements in its case in chief, but reserved the right to use them for the purpose of impeachment or rebuttal.  Consolidated Response of the United States to Defendant Moore' Pretrial Motions ("Gov't Resp. II"), p. 5 [Docket No. 36]; Tr. I at 84. As for Moore's Mirandized statements, the Government opposed the motion, arguing that Moore was not illegally detained because the search warrant specifically authorized the search of "any persons currently occupying the residence" and "any vehicle associated with the residence or the persons found within."  Gov't Resp. II, p. 5; Gov't Resp. III, p. 8 (citing Gov't Ex. 1).  The Government also maintained that Bailey did not apply because the search warrant encompassed occupants of the Desoto Street Residence, and Moore was detained moments after he left the Residence and entered a vehicle parked in front of the building.  Gov't Resp. III, pp. 8-9.  Thus, as contemplated by Bailey, where Moore was in the line of sight of the Residence and could have made an easy reentry back into it if he had not been detained, officer safety concerns were triggered, and detention was warranted.  Id., p. 9.

Further, the Government asserted that there was independent reasonable suspicion to believe that Moore was involved in illegal drug trafficking and to conduct a Terry stop of Moore based on the following evidence:

- Co-defendant Claybron had been seen coming and going from the Desoto residence numerous times in the past few weeks.  Gov't Ex. 1 at 3.

47

- An informant had identified Claybron as a heroin dealer (id. at 1), and that information was confirmed when Claybron was caught returning from Chicago with distribution quantities of heroin and cocaine.  Id. at 4.

- While Claybron was on his trip to Chicago, one of the phones that he used in his drug trafficking activities remained in the Twin Cities and was pinging in the area of the Desoto Street residence.  Id.

- On March 27, 2015, surveillance officers observed two unknown males (neither of whom could have been Claybron as Claybron was already in Chicago) exit the Desoto Street residence and drive away in a vehicle that registered to that residence, and they must have had the drug phone with them, as the phone continued to ping in the area to which they had driven.  Id.

Gov't Resp. III, pp. 9-10.  "Thus, when Moore came out of the Desoto residence as officers were preparing to execute the search warrant, there was at least reasonable suspicion to believe he was involved in the drug trafficking based at the Desoto Street residence.  Accordingly, the officers would have had the right to detain him even if they did not have an independent search warrant allowing them to do so."  Id. p. 10.

The Government also contended that Moore's tape-recorded statement should not be suppressed because the initial questioning by Agent Hage and Officer Nybeck was for officer safety purposes, and not an attempt to circumvent Miranda.  Gov't Resp. II, p. 5 (citing United States v. Walker, 518 F.3d 983, 985 (8th Cir. 2008); United States v. Rogers, 2013 WL 6388457, at *5 (D. Minn. Dec. 6, 2013)).  Finally, the Government submitted that there was no evidentiary support for Moore's allegation that officers threatened to arrest and charge Moore's pregnant girlfriend.  Gov't Resp. III, pp. 11-12 (citing Tr. I at 89, 94; Gov't Ex. 2; Gov't Ex. 7).

### 1.    Detention of Moore

"[T]he Supreme Court has squarely held 'that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.'"   United States v. Martinez-Cortes, 566 F.3d 767, 770 (8th Cir. 2009) (quoting Michigan v. Summers, 452 U.S. 692, 705 (1981)).   Consequently, "the resident of a home subject to a search warrant may be detained so as to prevent flight, minimize the risk of harm to the officers, and allow the officers to conduct an orderly search."   United States v. Johnson, 528 F.3d 575, 579 (8th Cir. 2008) (citation omitted); see also United States v. Sherrill, 27 F.3d 344, 346 (8th Cir. 1994) ("The minor intrusiveness of detaining a resident in his home is outweighed by the law enforcement interests in: (1) preventing flight if incriminating evidence is found; (2) minimizing the risk of harm to the officers from violent residents; and (3) conducting an orderly search with the resident's help in unlocking doors and containers.") (citing Summers, 452 U.S. at 701-03).

In United States v. Hogan, the Eighth Circuit reversed the district court's denial of defendant's motion to suppress evidence seized during the search of his vehicle, holding that police lacked authority to detain a defendant who was stopped three to five miles away from the premises to be searched, handcuffed, and taken back to his house. 25 F.3d 690, 693 (8th Cir. 1994).   The court noted that the defendant was not aware that a search was about to be conducted, and therefore, did not present a risk of flight or harm to law enforcement officers.   Id.

In Sherrill, after officers obtained a search warrant to search Sherrill's residence for evidence of crack distribution, and just before they executed the warrant, they

observed Sherrill leave his residence, get in his car, and drive off the premises.  27 F.3d

at 345.  Officers stopped Sherrill one block away from his house and informed him that

they were detaining him until the completion of the search.  Id.  The Eighth Circuit held

that "because Sherrill had already exited the premises, the intrusiveness of the officers'

stop and detention on the street was much greater," and therefore, the Summers rule

did not apply.[19]  Id. at 346 (citing Hogan, 25 F.3d at 693).  In reaching this conclusion,

the court observed that "when the officers stopped Sherrill, the officers had no interest

in preventing flight or minimizing the search's risk because Sherrill had left the area of

the search and was unaware of the warrant."  Id.

In Martinez-Cortes, a search warrant was issued for a single-family residence,

the person of and vehicles registered to William Baber, and any vehicles within the

curtilage located at the residence.  566 F.3d at 768, 770.  The warrant authorized a no-

knock entry due to the presence of a rifle at the residence, which could present danger

to the executing officers.  Id. at 768-69.  As police were preparing to execute the

warrant in the evening, they saw a Ford Excursion backing down the driveway of the

residence.  Id. at 769.  Officers had noticed the Excursion parked at the residence

during prior surveillance.  Id.  Officers stopped the Excursion in the driveway, and as

they approached the vehicle, they observed two unidentified persons in the front seat.

Id.  Neither of these individuals were Baber, but the officers could not see if anyone was

in the rear of the Excursion.  Id.  The officers ordered the two unidentified occupants to

show their hands.  Id.  Both occupants were observed moving their arms, and the

driver—later identified as Martinez-Cortez—was observed looking towards the middle

---

[19]    The court upheld the search of Sherrill's residence on other grounds.  Sherrill, 27
F.3d at 346-47.

console and moving as if to shove something between the center console and his right leg.  Id.  After several more demands by law enforcement, Martinez-Cortez put the car in park and both occupants showed their hands.  Id.  The occupants were ordered out of the vehicle and handcuffed.  Id.  After a routine check for warrants, Martinez-Cortez was arrested for an outstanding misdemeanor warrant and because his driving privileges had been revoked and suspended.  Id.  A search of the Excursion uncovered a several baggies of methamphetamine.  Id.

On appeal from his conviction, Martinez-Cortez argued that the initial stop of the Excursion, his subsequent arrest, and the search of the vehicle were unlawful, as he had committed no traffic violation, officers had no reasonable suspicion that criminal activity was afoot, and his detention was unreasonably extended for a records check. Id.  The Eighth Circuit disagreed, holding that the stop of the Excursion was justified for three reasons.

> First, the search warrant authorized the officers to search, not only the residence, but also vehicles registered to Baber and vehicles located within the property's curtilage.  When they arrived to execute the warrant, the officers saw a vehicle previously seen at that location backing down the driveway. It had just left the curtilage, where it could be searched. It might be registered to Baber, in which case it could be searched wherever found. Thus, the officers had reason to believe that the warrant authorized search of the vehicle, and it was reasonable to stop the vehicle to determine whether it should be included in the warrant search.

Id. at 770.

Second, it was reasonable to stop the Excursion to determine whether any occupant was a resident of the property that was the subject of the search warrant, including Baber.  Id.  "Moreover, the Supreme Court has squarely held 'that a warrant to

search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.'" Id. (quoting Summers, 452 U.S. at 705).  Because the detention of occupants while a house is being searched "'prevent[s] flight in the event that incriminating evidence is found' and facilitates 'the orderly completion of the search,'" (id., quoting Summers, 452 U.S. at 702-03), the appellate court reasoned that "officers acted reasonably in detaining Martinez–Cortes while they conducted a records check that might reveal whether he was an occupant of the property."  Id. (citing United States v. Gill, 290 F. App'x 965, 967 (8th Cir. 2008) (unpublished) (holding that it was reasonable to conduct a Terry stop of person exiting residence about to be searched in order to determine whether he was a resident).

Third, the Eighth Circuit found that "stopping the Excursion was justified by the strong interest in protecting the safety of officers engaged in the inherently dangerous activity of executing a warrant to search for narcotics."  Id. (citing L.A. County v. Rettele, 550 U.S. 609, 614 (2007); Summers, 452 U.S. at 702).  The court indicated that officers had sufficient evidence of firearms on the premises such that the reviewing magistrate had issued a no-knock warrant.  Id.  The court also noted that it was dark outside and the Excursion, which had previously been seen at the residence, was close enough to the residence that "'an armed individual inside could pose a danger to the officers on the scene.'"  Id. (citations omitted).  For example, "had the officers allowed the Excursion to drive away, they faced the risk that its occupants would use a cell phone to warn those in the house of the imminent search, thereby undermining the protections of a no-knock entry."  Id.  Additionally, the court found that the furtive actions of Martinez-

Cortez and the other occupant (refusal to promptly comply with orders to put the vehicle in park and show their hands, and the movement by Martinez–Cortes as if to hide something between his leg and the car's console), "gave the officers reason to suspect, indeed, probable cause to believe that criminal activity was afoot, and that the occupants might be a risk to officer safety unless detained while the warrant search was completed." Id. at 771. Thus, the inherent risks to officer safety were magnified by the occupants' actions and "justified the officers' decisions to order Martinez–Cortes out of the Excursion." Id.

In 2013, the United States Supreme Court was called upon to address the scope and application of Summers. In Bailey, police had obtained a warrant to search an apartment for a handgun after a confidential informant had told police that he had observed the gun when he was at the apartment to purchase drugs from "a heavy set black male with short hair" known as "Polo." 133 S. Ct. at 1036. As police were preparing to execute the warrant, they observed two men—both matching the description of "Polo"—leave the gated area above the basement apartment, enter a car parked in the driveway and drive away. Id. There was no indication that the men knew of the officers' presence or the impending search. Id. When the car was a few hundred yards down the street, the officers began to follow it. Id. After trailing the car for about a mile, the officers pulled the vehicle over, and placed the two occupants in handcuffs. Id. In response to Bailey's question as to why he was stopped, the occupants were told that they were being detained incident to the execution of a search warrant at the apartment. Id. Bailey responded: "I don't live there. Anything you find there ain't mine, and I'm not cooperating with your investigation." Id. (citations omitted). Bailey and the

other occupant were then taken back to the apartment, and Bailey's car was returned to the search scene.  Id.  By the time the group returned to the apartment, the search team had discovered a gun and drugs in plain view inside the apartment.  Id.  Bailey was placed under arrest, and his keys were seized incident to the arrest.  Id.  Officers later discovered that one of Bailey's keys opened the door of the basement apartment.  Id.

Bailey moved to suppress the apartment key and the statements he made when stopped by the officers on grounds that the evidence derived from an unreasonable seizure.  Id.  The district court denied Bailey's motion to suppress, holding that his detention was permissible under Summers as a detention incident to the execution of a search warrant; alternatively, the court found that the detention was lawful as an investigatory detention supported by reasonable suspicion under Terry v. Ohio.  Id. at 1037.  The Second Circuit ruled that Bailey's detention was proper and affirmed denial of the suppression motion based on Summers.  Id.

The Supreme Court reversed.  In so doing, the Court explained that the issue presented was whether the reasoning in Summers justified Bailey's detention beyond the immediate vicinity of the premises being searched, where he had left the apartment before the search began and officers waited to detain him until he was almost a mile away.  Id. at 1038.  The Court initially noted that "[a]n exception to the Fourth Amendment rule prohibiting detention absent probable cause must not diverge from its purpose and rationale."  Id. (citing Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification")).  The Court then proceeded to discuss the three reasons for the rule articulated in Summers—"officer safety, facilitating the completion of the search, and

54

preventing flight"—to determine if its rationale extended to the detention of Bailey.  Id. (citing Summers, 452 U.S., at 702–703).

> The first interest identified in Summers was "the interest in minimizing the risk of harm to the officers." There the Court held that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence," and "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.".

Id. at 1038 (quoting Summers, 452 U.S. at 702-03).

Nevertheless, the Court rejected officer safety as a basis for applying Summers to Bailey on several grounds.  "In the instant case Bailey had left the premises, apparently without knowledge of the search. He posed little risk to the officers at the scene. If Bailey had rushed back to his apartment, the police could have apprehended and detained him under Summers. There is no established principle, however, that allows the arrest of anyone away from the premises who is likely to return."  Id. at 1039. Further, "[u]nexpected arrivals by occupants or other persons accustomed to visiting the premises might occur in many instances. Were police to have the authority to detain those persons away from the premises, the authority to detain incident to the execution of a search warrant would reach beyond the rationale of ensuring the integrity of the search by detaining those who are in fact on the scene."  Id.  Lastly, the Court stated that the theoretical risk that "a departing occupant might notice the police surveillance and alert others still inside the residence," did not "justify expanding the existing categorical authority to detain so that it extends beyond the immediate vicinity of the premises to be searched."  Id. at 1039-40.  As the Court explained: "If extended in this way the rationale would justify detaining anyone in the neighborhood who could alert

occupants that the police are outside, all without individualized suspicion of criminal activity or connection to the residence to be searched. This possibility demonstrates why it is necessary to confine the Summers rule to those who are present when and where the search is being conducted." Id. at 1040 (emphasis added).

The second interest relied upon in Summers was that "the orderly completion of the search may be facilitated if the occupants of the premises are present." Id. (quoting Summers, 452 U.S. at 703).  After all, "[i]f occupants are permitted to wander around the premises, there is the potential for interference with the execution of the search warrant. They can hide or destroy evidence, seek to distract the officers, or simply get in the way." Id.  But the Court rejected this second justification as basis for upholding Bailey's detention because "[t]hose risks are not presented by an occupant who departs beforehand. . . . Had [Bailey] returned, officers would have been free to detain him at that point. A general interest in avoiding obstruction of a search, however, cannot justify detention beyond the vicinity of the premises to be searched." Id.[20]

As for the third law enforcement interest articulated in Summers—prevention of flight in the event that incriminating evidence is found—the Court stated:

> [T]his justification serves to preserve the integrity of the search by controlling those persons who are on the scene. If police officers are concerned about flight, and have to keep close supervision of occupants who are not restrained, they might rush the search, causing unnecessary damage to property or compromising its careful execution. Allowing officers to secure the scene by detaining those present also

---

[20]    The Court also rebuffed the justification noted in Summers that occupants can be detained because they can assist officers in their search efforts.  133 S. Ct. at 1040. According to the Court, "[t]his justification must be confined to those persons who are on site and so in a position, when detained, to at once observe the progression of the search; and it would have no limiting principle were it to be applied to persons beyond the premises of the search." Id.

prevents the search from being impeded by occupants leaving with the evidence being sought or the means to find it.

The concern over flight is not because of the danger of flight itself but because of the damage that potential flight can cause to the integrity of the search. This interest does not independently justify detention of an occupant beyond the immediate vicinity of the premises to be searched. The need to prevent flight, if unbounded, might be used to argue for detention, while a search is underway, of any regular occupant regardless of his or her location at the time of the search. If not circumscribed, the rationale of preventing flight would justify, for instance, detaining a suspect who is 10 miles away, ready to board a plane. The interest in preventing escape from police cannot extend this far without undermining the usual rules for arrest based on probable cause or a brief stop for questioning under standards derived from <u>Terry</u>. Even if the detention of a former occupant away from the premises could facilitate a later arrest should incriminating evidence be discovered, the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment.

<u>Id.</u> at 1040-41 (quotations omitted).

In summary, "<u>Summers</u> recognized that a rule permitting the detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion, was reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search. Because this exception grants substantial authority to police officers to detain outside of the traditional rules of the Fourth Amendment, it must be circumscribed." <u>Id.</u> at 1041-42.

A spatial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a search warrant. The police action permitted here—the search of a residence—has a spatial dimension, and so a spatial or geographical boundary can be used to determine the area within which both the search and detention incident to that search may occur. Limiting the rule in <u>Summers</u> to the area in which an occupant poses a real threat to the safe and efficient

> execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe.

Id. at 1042.

Consequently, "[i]f officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity, the lawfulness of detention is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under Terry or an arrest based on probable cause." Id.; see United States v. Rhodes, 730 F.3d 727, 731 (8th Cir. 2013) (observing that based on Bailey's interpretation and application of Summers, "once an individual has left the immediate vicinity of a premises that is being searched or is about to be searched pursuant to a search warrant, his involuntary detention must be justified by some rationale other than that it is incident to execution of the warrant."), cert. denied, 134 S. Ct. 1525 (2014).

The Court declined to provide further guidance with respect to the phrase "immediate vicinity," holding that Bailey had been detained "at a point beyond any reasonable understanding of the immediate vicinity of the premises in question . . . ." Id. However, the Court noted that "[i]n closer cases courts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." Id.

Based upon the above authority, and the facts and circumstances of the instant case, this Court concludes that the stop of the black BMW and detention of Moore incident to the execution of the search warrant was unlawful.

First, the search warrant did not allow for the seizure of Moore.  The search warrant for the Desoto Street Residence permitted officers to search "any person(s) currently occupying the residence" and "any vehicles associated with the residence or person(s) found within."  Gov't Ex. 1, p. 7.  However, when officers apprehended Moore, they had no information regarding him; they had no information that he currently occupied the residence; and they had never seen the BMW at the residence from which they could conclude that he or the vehicle were associated with the residence.  Tr. I at 73-75, 78, 112-14.  Lacking any evidence that Moore was an occupant of premises or that the BMW was tied somehow to the residence, the search warrant did not allow law enforcement to use the warrant as the basis for their stop and seizure of Moore.  Further, even if the search warrant had specifically <u>authorized</u> the search of Moore's person, which it did not, there is no evidence that law enforcement officers detained Moore to effectuate such a search, as officers had no idea who Moore was prior to the execution of the search warrant at the Desoto Street Residence.  <u>See</u> <u>United States v. Gildersleeve</u>, 2013 WL 1908049, at *8 (W.D.N.Y. April 19, 2013).

Second, based on the evidence presented to the Court, it cannot conclude that the stop occurred within the "immediate vicinity" of the Desoto Street Residence.  Detective Husevold testified that he observed Moore leave the Desoto Street Residence, but he did not apprehend him on the premises or as he left the premises.  Further, Detective Husevold admitted that the stop of the BMW took place outside the

curtilage of the Residence.  Tr. I at 77.  As to where the BMW was located in relation to the Desoto Street Residence, Detective Husevold testified that it was parked in front of the Residence; then he testified it was "up the street to the north" of the Residence, but he could not recall how far.  Id. at 74.  No estimate of distance was elicited from Officer Huseveld; no diagrams or pictures were presented for the Court to assess exactly where the BMW was located in relation to the Residence, whether the occupants of the vehicle had a clear line of sight to the Residence, or their ease of access to the Residence.  See United States v. Ruiz, 2014 WL 10183873, at *8 (W.D. Tex. Aug. 25, 2014) (finding that police had authority to detain defendant incident to execution of search warrant when defendant was stopped approximately 390 feet from the residence with clear line of sight and no impediments in between); United States v. Murray, 2014 WL 2531949, at *8 (N.D. Ga. June 5, 2014) ("The first Bailey factor does admittedly militate against that conclusion. According to Murray, he was standing on his neighbor's gravel driveway. That would presumably put him beyond the 'lawful limits of [his home].' But the other two Bailey factors support the conclusion and the lawfulness of the detention: Murray was only ten to fifteen yards away and was thus easily 'within the line of sight' of the home, and he could have easily reentered the home from his location.") (citations and footnote omitted); Gildersleeve, 2013 WL 1908049, at *3, 7-8 (finding that the detention of defendant 100 to 200 feet outside of his home in connection with the planned execution of a search warrant of his residence did not comport with Summers and was improper in light of Bailey).[21]

---

[21]    In all three cases, evidence via testimony, diagrams or pictures was submitted to the court to establish where the detention occurred in relation to the search of the premises subject to the search warrant.  See Ruiz, 2014 WL 10183873, at 3 (car

Moreover, while it is true that the BMW was physically closer to the targeted premises than in <u>Hogan</u> (three to five miles), <u>Bailey</u> (one mile), and <u>Sherrill</u> (one block), none of the reasons articulated in <u>Bailey</u> for applying the <u>Summers</u> rule—officer safety, orderly search and flight risk—were present to justify the stop and apprehension of Moore on the street and outside the curtilage of the DeSoto Street Residence.

For starters, as in <u>Bailey</u>, there is no evidence that Moore left the Desoto Street Residence knowing of the search that was about to take place.  Thus, he not only "posed little risk to the officers at the scene," but even if he had rushed back to the apartment, "the police could have apprehended and detained him under <u>Summers</u>." <u>Bailey</u>, 133 S. Ct. at 1039.  The possibility that Moore might have noticed the police surveillance and alerted others still inside the residence, did not "justify expanding the existing categorical authority to detain so that it extends beyond the immediate vicinity of the premises to be searched."  <u>Id.</u> at 1039-40.

Similarly, there was no basis for concluding that Moore could have interfered with the orderly execution of the search where, like Bailey, he had departed even before the search commenced.  Again, had Moore returned, "officers would have been free to detain him at that point.  A general interest in avoiding obstruction of a search, however, cannot justify detention beyond the vicinity of the premises to be searched."  <u>Id.</u> at 1040.

Additionally, the interest in preventing Moore's flight in the event that incriminating evidence was found was not present.  As the Supreme Court observed,

_____

stopped within 130 yards of the residence as evidenced by photographs showing the location of the stop and the residence); <u>Murray</u>, 2014 WL 2531949, at *5 (defendant was stopped between 10 and 15 yards from his home on a gravel area abutting the driveway of the home); <u>Ruiz</u>, 2014 WL 10183873, at *3, 8 (referencing exhibit showing location of stop in relation to defendant's residence).

that interest comes into play only if those persons present at the scene of the search could somehow impede the integrity of the search. Id. at 1041. Here, however, Moore was not on the premises when the search was undertaken and had no ability impact the progression of the search, or take evidence sought by the search or the means to locate it. Id. at 1040.

For all of these reasons, the Court finds that Moore's detention was unlawful under Bailey.

Third, the Government's alternative argument that officers had independent reasonable suspicion to conduct a Terry stop of Moore outside the Desoto Street Residence, is not supported by the facts. The only evidence cited by the Government is the statements in Detective Serafin's affidavit accompanying his application for the search warrant for the Desoto Street Residence that (1) on March 27, 2015, officers observed two unknown males exit the Desoto Street Residence and drive away in a vehicle registered to Amanda Hobbs who lived at the Residence; and (2) through electronic surveillance, police saw that one of the phone numbers used by Claybron for heroin trafficking was pinging in the area to which the two men had driven. Gov't Ex. 1, p. 4. However, no one knew the identity of the two men or what they were doing on March 27, and no one had any information to tie them to the drug trafficking activities of Claybron. Thus, officers had no idea who Moore was at the time he was detained. Indeed, it was not until after the execution of the search warrant that Detective Serafin was able to identify one of the two men observed by law enforcement on March 27, 2015, as Moore. Tr. I at 78. Further, officers had never observed the BMW at the Desoto Street Residence prior to March 30, 2015, and had never tied it to any drug

trafficking activities.  Because "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citation omitted), the Court concludes that officers lacked reasonable suspicion to conduct a Terry stop of Moore outside the Desoto Street Residence.

For all of these reasons, the Court concludes that the Moore was unlawfully detained incident to the execution of the search warrant.

## 2.   Moore's Tape-Recorded Statement

Where a confession is obtained by exploitation of an illegal arrest, "well-established precedent requires suppression of the confession unless that confession was an act of free will [sufficient] to purge the primary taint of the unlawful invasion.'" Kaupp v. Texas, 538 U.S. 626, 632 (2003) (alteration in original) (quoting Wong Sun, 371 U.S. at 486).  "Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State." Id. at 633 (citation omitted).  In determining whether the taint of an illegal arrest has been sufficiently purged, "[r]elevant considerations include observance of Miranda, '[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'" Id. at 633; cf. United States v. Brandwein, 2015 WL 4745929, at *4 (8th Cir. Aug. 12, 2015) ("Whether consent sufficiently disperses the taint of an unlawful entry is determined by reference to 'temporal proximity' between the entry and the consent, 'the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'") (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

The circumstances of this case demonstrate that the taint of Moore's unlawful arrest was not sufficiently purged.  First, the seizure of Moore and his subsequent confession occurred at virtually the same time and place.  Moore was stopped just prior to the execution of the search warrant, and the tape-recorded interview of Moore took place only five to ten minutes after Officer Nybeck arrived at the Desoto Street Residence.[22]  See United States v. Whisenton, 765 F.3d 938, 941-42 (8th Cir. 2014) ("Under our precedent, fifteen minutes is sufficient to demonstrate an attenuation of the illegality") (citing United States v. Barnum, 564 F.3d 964, 972 (8th Cir. 2009) (12 to 15 minutes); United States v. Esquivel, 507 F.3d 1154, 1160 (8th Cir. 2007) (9 and 1/2 minutes)).  Thus, the "temporal proximity" of the arrest and confession weighs against a finding that the taint was sufficiently purged.

Second, there is no evidence of "intervening circumstances that provide[d] [Moore] an opportunity 'to pause and reflect, to decline consent, or to revoke consent' . . . ."  Whisenton, 765 F.3d at 942 (quoting United States v. Greer, 607 F.3d 559 (8th Cir. 2010)).  Rather, Moore was stopped, handcuffed, questioned outside the Desoto Street Residence by both Agent Hage and Officer Nybeck, and then brought inside the Residence for the tape-recorded interview—all within five or ten minutes of the initial seizure.

Third, the "purpose and flagrancy of the official misconduct" weighs against a finding that the taint of Moore's illegal seizure was sufficiently purged.  As set forth above, Moore's arrest incident to the execution of the search warrant was not justified by any of the Summers factors—officer safety, orderly completion of search, and

_____

[22]    Officer Nybeck arrived at the Residence 30 seconds to a minute after Moore was detained.  Tr. I at 82.

prevention of flight.  When officers arrested Moore, they had no idea who he was and had no information connecting him to the Desoto Street Residence or drug trafficking activity.  Moore was not found inside the Residence, where he might have interfered with the orderly completion of the search.  Rather, he was observed leaving the premises and getting in a car, which was parked outside the curtilage of the Residence. Further, there was no indication that Moore was aware that law enforcement was nearby.  Thus, any concerns for officer safety or prevention of flight were not present. In short, officers had no reasonable justification for detaining Moore incident to the execution of the search warrant.

Finally, although Moore was advised of his Miranda rights by Officer Nybeck prior to the tape-recorded interview, the Supreme Court has held that "'Miranda warnings, alone and per se, cannot always ... break, for Fourth Amendment purposes, the causal connection between the illegality and the confession.'" Kaupp, 538 U.S. at 633 (2003) (emphasis in original) (quoting Brown, 422 U.S. at 603).  Because all of the other factors weigh against a finding that the taint of Moore's illegal arrest was sufficiently purged, the Court concludes that advisement of his Miranda rights cannot save Moore's tape-recorded statements.

Accordingly, Moore's motion to suppress his statements, confessions and admissions should be granted.[23]

---

[23]    Had this Court found that Moore was lawfully detained, it would have recommended that his motion to suppress his Mirandized statements and confessions be denied even though they followed the statements he made to Officer Nybeck and Agent Nybeck.

In Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court considered the admissibility of statements made after belated Miranda

warnings during continuing interrogations. In that case, a divided Court disapproved of a two-stage interrogation technique in which the police deliberately failed to provide <u>Miranda</u> warnings before an initial round of questioning until they elicited a confession from the suspect; the police then sought to have the suspect repeat the confession in a second interview that was conducted after <u>Miranda</u> warnings were given.

<u>United States v. Terry</u>, 400 F.3d 575, 581 (8th Cir. 2005). "The Supreme Court held that [the confession] was inadmissible because the officer's interrogation technique rendered the Miranda warning ineffective." <u>United States v. Torres-Lona</u>, 491 F.3d 750, 757 (8th Cir. 2007) (citing <u>Seibert</u>, 542 U.S. at 617). "Justice Kennedy concurred in the result in <u>Seibert</u>, but wrote separately to express the view that the Court's reasoning would apply only to the intentional use of a two step interrogation process in an effort to circumvent Miranda requirements." <u>Id.</u> (citation omitted). "Where there has been no such calculated effort, the admissibility of a post warning statement should continue to be governed by <u>Oregon v. Elstad</u>, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In <u>Elstad</u> the Supreme Court held that a post warning confession is admissible so long as it was knowingly and voluntarily made." <u>Id.</u> at 757-58 (citations omitted).

"We treat Justice Kennedy's concurrence as controlling since it provided the fifth vote necessary for a majority and since it was decided on narrower grounds than the plurality opinion." <u>Id.</u> at 758 (citing <u>United States v. Briones</u>, 390 F.3d 610, 613 (8th Cir. 2004)); <u>see also</u> <u>United States v. Ollie</u>, 442 F.3d 1135, 1142 (8th Cir. 2006)) ("Because Justice Kennedy provided the fifth vote and his concurrence resolved the case on narrower grounds than did the plurality, it is his reasoning that rules the present case.") (citations omitted).

"The first step in Justice Kennedy's analysis is to determine whether a staged interrogation process was used as a deliberate strategy." <u>Briones</u>, 390 F.3d at 614. Upon arriving at the Desoto Street Residence to assist in the execution of the search warrant, both Officer Nybeck and Agent Hage asked Moore whether the Residence contained weapons, animals, or anything that could be harmful to officers. Tr. I at 83, 115-16. Officer Nybeck testified that he asked these questions to ensure the safety of himself and other officers conducting the search. <u>Id.</u> at 83. There is no evidence that Officer Nybeck or Agent Hage were deliberately attempting to subvert <u>Miranda</u> by staging a two-step interrogation process. <u>See</u> <u>Terry</u>, 400 F.3d at 582 ("There is no evidence that the police engaged in a deliberate strategy to undermine the <u>Miranda</u> warnings.").

"The question then becomes whether [Moore's] statements . . . are admissible under <u>Elstad</u>." <u>Briones</u>, 390 F.3d at 614. Here, the record shows that Officer Nybeck read Moore his <u>Miranda</u> rights. Tr. I at 87. Moore indicated that he understood his rights and agreed to be interviewed. <u>Id.</u> The interview lasted only 1/2 hour to 45

## V.    CLAYBRON'S MOTION TO SUPPRESS STATEMENTS

Claybron has moved the Court to suppress his statements given to law enforcement during a tape-recorded interview on March 31, 2015.  Claybron maintained that his statements were coerced by law enforcement officers when they turned off the recording device and threatened to take away Claybron's infant children if he did not cooperate.  [Docket No. 45].  The Government responded that there was no evidentiary support for Claybron's allegation.  Gov't Resp. I, p. 6.  The Court agrees.

At the hearing on June 25, 2015, the following exchange took place between Officer Nybeck and Claybron's counsel Paul Edlund:

> Edlund:    During the time when that tape was off, did Mr. Claybron inquire about his children?
>
> Nybeck:    I don't recall.  It may have been either on or when it was off, but I don't recall at what point.
>
> Edlund:    While the tape was off, did officers, any of them in particular Mr. Williams talk about that they've got Mr. Claybron's kids?

---

minutes.  Id. at 88.  During the interview, Moore never requested a lawyer and never asked to terminate the interview.  Id. at 88-89.  Officers did not employ threats or make any promises to force Moore to speak with them.  Id. at 89.

The Court rejects Moore's argument that his confession was coerced by officers' threats to arrest and charge his pregnant girlfriend.  At the hearing on June 25, 2015, Officer Nybeck denied ever threatening to arrest or charge Moore's girlfriend.  Tr. I at 89, 90.  To the contrary, during the tape-recorded interview, officers informed Moore that they would not arrest his girlfriend so that she could take care of Moore's child.  Gov't Ex. 2 at 13:30.  As such, Moore has failed to establish any factual basis for this claim.

Based upon these facts, Moore's statements to law enforcement were given knowingly and voluntarily, and therefore, Moore's post-Miranda statements were admissible under Elstad.  See United States v. Walker, 518 F.3d 983, 985 (8th Cir. 2008) ("Walker presented no evidence that Officer Yardley used coercion in eliciting the first statement, that the Miranda waiver signed by Walker before the second statement was not knowing and voluntary, or that the second statement was in any way coerced."); Terry, 400 F.3d at 582.

| Nybeck: | I think he may have mentioned that because Mr. Claybron was asking like where are my kids?  And I think Mr. Williams told him that the kids were dropped off with his Grandma Yoyo. |
|---|---|
| Edlund: | And is that while the tape was off or the tape was on? |
| Nybeck: | I don't recall. |

Tr. I at 110-11.

As shown by the above exchange, Claybron's counsel had a full opportunity to question Officer Nybeck as to any threats made to Claybron and his children.  Based upon Officer Nybeck's responses, the Court concludes that Claybron has failed to establish any factual basis for his motion to suppress statements.  Accordingly, Claybron's motion should be denied.

## VI.   MOTION FOR FRANKS HEARING AND SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE

### A.   Factual Background

On June 26, 2015, pursuant to Franks v. Delaware, 438 U.S. 154 (1978), defendants jointly moved the Court for a hearing on the truthfulness and accuracy of the affidavits submitted in support of the search warrants for the Nissan Juke, phone numbers (612) XXX-XXXX and (952) XXX-XXXX, and the Desoto Street Residence and East 10th Street Residence on the grounds that the applications included intentional or reckless misrepresentations or omissions of fact material to a finding of probable cause. [Docket No. 53].   Defendants also filed a joint motion requesting permission to supplement their outstanding suppression motions with their joint motion for a Franks hearing.  [Docket No. 52].

In support of their motions, the defendants relied on the testimony of Officer Nybeck, who testified that a CI's criminal history and cooperation with law enforcement was important information that should be included in a supporting affidavit so that the reviewing judge can make a fully informed decision whether to issue a warrant.[24]  Tr. I at 98-100.   Based on this testimony, defendants argued that Detective Serafin intentionally omitted information in his supporting affidavit regarding the CI's criminal history and cooperation in connection with a federal indictment.  Moore Mem., p. 12; Claybron Mem., p. 5.  Defendants maintained that such omissions were material to the credibility of the CI, and therefore, the reviewing judge was entitled to know whether the CI was facing a mandatory minimum sentence and whether the CI had a criminal history.  Moore Mem., pp. 12-13; Claybron Mem., p. 5.  According to defendants, the intentional omission of this information requires this Court to analyze whether probable cause existed in the supporting affidavit without any information supplied by the CI. Moore Mem., p. 13; Claybron Mem., pp. 5-6.

The Government responded that there was no basis for a Franks hearing, much less a basis for suppression based upon an alleged Franks violation.  In a nutshell, the Government submitted that the omission of the fact of an informant's cooperation with law enforcement does not constitute a Franks violation and is not even a basis for a Franks hearing.   Response of the United States to Defendants' Joint Motion for a Franks Hearing, p. 2 [Docket No. 55].  In addition, the Government urged that the

---

[24]   Officer Nybeck also testified that whether the CI's criminal history should be included in an affidavit supporting a search warrant depends on the nature of the criminal history.  Tr. I at 100.  For example, if the person has a "bunch of parking tickets or they have a bunch of DWIs and this is a dope-related case," the judge does not need to know that information.  Id.

omission of the CI's criminal history is not a basis for suppression under Franks because the CI has no substantial criminal history; therefore, even if such information had been included in the affidavits, it would not have negated probable cause.  Gov't Resp. III, pp. 12-13 (citing United States v. Reinholz, 245 F.3d 765, 774 (8th Cir. 2001)).

On July 9, 2015, in light of Officer Nybeck's testimony and in an abundance of caution, the Court conducted an evidentiary hearing and took testimony from Detective Travis Serafin of the Eden Prairie Police Department.  During the hearing, Detective Serafin testified that he intentionally omitted from his affidavit any reference to the CI's criminal history.  Tr. II at 55-57.  Detective Serafin also stated that, at the time he drafted the affidavits, he knew the CI was under indictment for a federal drug case and that the CI was cooperating with law enforcement; however, he intentionally omitted any information regarding the CI's cooperation in a federal drug case.  Id. at 57, 58. Detective Serafin testified that he omitted this information to protect the identity and safety of the CI, and not to mislead the reviewing judges.  Id. at 36-37, 38.  Detective Serafin stated that none of the reviewing judges questioned him with regard to the criminal history status of the CI.  Id. at 37, 38.

Following the hearing, the Government submitted, for in camera inspection, a letter describing the CI's criminal history and cooperation with law enforcement, including the plea agreement filed in connection with the federal drug charge pending against the CI at the time the search warrants were obtained.  The Government's letter explained that the CI had a minimal criminal history, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████ The CI's Presentence

Investigation Report, which was also provided to the Court for <u>in camera</u> inspection,

confirmed the Government's representations.

**B.**   **Analysis**

"The Fourth Amendment requires a showing of probable cause before a search

warrant may be issued.   Determinations of probable cause must be premised on the

totality of the circumstances."   <u>Williams</u>, 477 F.3d at 557.   "The task of the issuing

magistrate is simply to make a practical, common-sense decision whether, given all the

circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of

knowledge' of persons supplying hearsay information, there is a fair probability that

contraband or evidence of a crime will be found in a particular place."   <u>Gates</u>, 462 U.S.

at 238.   On the other hand --

> [w]here an issuing judge's probable cause determination was
> premised on an affidavit containing false or omitted
> statements, the resulting search warrant may be invalid if the
> defendant can prove by a preponderance of evidence "(1)
> that the police omitted facts with the intent to make, or in
> reckless disregard of whether they thereby made, the
> affidavit misleading ... and (2) that the affidavit, if
> supplemented by the omitted information would not have
> been sufficient to support a finding of probable cause."

<u>Williams</u>, 477 F.3d at 557 (citations omitted); <u>see</u> <u>also</u> <u>United States v. Bausby</u>, 720

F.3d 652, 657 (8th Cir. 2013) ("To void a search warrant under <u>Franks</u> based on a claim

of factual omission, a defendant must show by a preponderance of the evidence 'first

that facts were omitted with the intent to make, or in reckless disregard of whether they

make, the affidavit misleading, and, second, that the affidavit, if supplemented by the

omitted information, could not support a finding of probable cause.'") (quoting <u>Allen</u>, 297

F.3d at 795).  However, "[a] separate hearing is required to invalidate a warrant on this basis."  United States v. Andolini, Crim. No. 11-196 (JRT/JSM), 2011 WL 4842545, at *4 (D. Minn. Oct. 12, 2011).  To receive a hearing on this issue, a defendant must make a "'substantial preliminary showing' of deliberate falsehood or reckless disregard for the truth."  United States v. Carnahan, 684 F.3d 732, 735 (8th Cir. 2012) (quoting Williams, 477 F.3d at 557-58).  "Because '[t]here is ... a presumption of validity with respect to the affidavit supporting the search warrant[, t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.'  The substantiality requirement is not lightly met."  Williams, 477 F.3d at 558 (alterations in original) (internal citation omitted) (citing United States v. Wajda, 810 F.2d 754, 759 (8th Cir. 1987)).

Based on the testimony of Officer Nybeck, the Court finds that defendants were entitled to the Franks hearing.  However, the Court concludes that there was no Franks violation.  Although Detective Serafin testified that he intentionally admitted any reference to the CI's criminal history and cooperation, "[t]his finding by itself is not sufficient to vitiate the warrant, however, for every factual omission is intentional insofar as the omission is made knowingly."  United States v. Ketzeback, 358 F.3d 987, 990 (8th Cir. 2004). (citing United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990)).  "The inquiry must proceed, then, to the further question whether the officer omitted the facts with the intent to mislead or in reckless disregard of the omissions' misleading effect."  Id. (citation omitted).  Here, Detective Serafin testified that he omitted any reference to the CI's criminal history or cooperation to protect the identity and safety of the CI.  Detective Serafin also testified that none of the reviewing judges ever asked him

about the status or criminal history of the CI.  As such, there is no evidence that Detective Serafin intended to mislead the reviewing judges by omitting the information.

More significantly, "[t]hough our precedent states that the reckless disregard for the truth may be inferred from the fact that ... information was omitted, this inference is valid only when the defendant shows that the omitted material would be clearly critical to the finding of probable cause." United States v. Gonzalez, 781 F.3d 422, 431 (8th Cir. 2015) (citations and internal quotations marks omitted).  "[P]robable cause is not defeated by a failure to inform the magistrate judge of an informant's criminal history if the informant's information is at least partly corroborated," Williams, 477 F.3d at 559-60 (citations omitted), or when "the confidential informant had supplied information in the past that was reliable and . . . the informant had not given false information in the past." Flagg, 919 F.2d at 501; see also Williams, 477 F.3d at 560 ("Probable cause is likewise not found wanting where the affiant establishes the information's reliability through some other means.") (citations omitted).  "Furthermore, a magistrate generally would not be misled by the alleged omissions of facts in this case because informants frequently have criminal records and often supply information to the government pursuant to plea arrangements." Flagg, 919 F.2d at 501.

In this case, even if the supporting affidavits had included the CI's minimal criminal history and ongoing cooperation with law enforcement in connection with a federal drug indictment, probable cause existed to issue each of the search warrants, with the exception of the search warrant for phone number (952) XXX-XXXX, which this

Court recommended upholding based on Leon.[25]   The supporting affidavit for (612) XXX-XXXX established that the CI had a track record of supplying truthful information to law enforcement; the affidavit for the search warrant for the Nissan Juke established that the CI had a track record of supplying truthful information to law enforcement and the information the CI provided was independently corroborated; and the affidavits accompanying the search warrants for the Desoto Street and 10th Street Residences were not only based on information provided by a reliable CI which was independently corroborated, but, as discussed in Section III, supra, numerous other facts which established probable cause to search those premises.

Accordingly, defendants' joint motion to suppress all of the search warrants obtained by law enforcement in this case based on an alleged Franks violation should be denied.

## VII.    RECOMMENDATION

For the reasons stated above, IT IS HEREBY RECOMMENDED that

1.      Moore's Motion to Suppress Confessions, Admission or Statements Made in the Nature of Confessions Made by the Defendant [Docket No. 32] be **GRANTED**.

2.      Defendant Moore's Motion to Suppress Evidence Obtained Through Illegal Search [Docket No. 33] be **DENIED**.

---

[25]      Defendants contended that a proper Franks analysis requires this Court to ignore all of the information provided by the CI in determining whether the affidavits were supported by probable cause.   Moore Mem., p. 13; Claybron Mem., pp. 5-6. Defendants are incorrect.   Although the Court must delete any affirmative misrepresentations contained in the affidavit, see Reinholz, 245 F.3d at 774-75, the proper procedure for omitted facts is to supplement the affidavit with the missing information and determine whether probable cause still existed. See Allen, 297 F.3d at 796 ("[E]ven if all three of the above items were included in the search warrant affidavit, it still would have supported a finding of probable case.").

3.      Defendant Claybron's Motion to Suppress Evidence Obtained as a Result of Electronic Tracking of Phone Number (612) XXX-XXXX [Docket No. 41] be **DENIED**.

4.      Defendant Claybron's Motion to Suppress Evidence Obtained as a Result of Electronic Tracking of Phone Number (952) XXX-XXXX [Docket No. 42] be **DENIED**.

5.      Defendant Claybron's Motion to Suppress Evidence Obtained as a Result of Electronic Tracking of Nissan Juke Bearing MN Plate 357XXX [Docket No. 43] be **DENIED**.

6.      Defendant Claybron's Motion to Suppress Evidence Obtained as a Result of Unlawful Stop, Search and Seizure of Defendant [Docket No. 44] be **DENIED**.

7.      Defendant Claybron's Motion to Suppress the Statement of Defendant [Docket No. 45] be **DENIED**.

8.      Defendant Claybron's Motion to Suppress Evidence Obtained as a Result of Unlawful Search at XXXX Desoto St. [Docket No. 46] be **DENIED**.

9.      Defendant Claybron's Motion to Suppress Evidence Obtained as a Result of Unlawful Search at XXXX East 10th St. Apt. XXXX [Docket No. 47] be **DENIED**.

10.     Defendants' Joint Motion to Supplement Defendants' Motions to Suppress Evidence [Docket No. 52] be **DENIED**.

11.     Defendants' Joint Motion for a <u>Franks</u> Hearing [Docket No. 53] was **GRANTED**.

Dated:      September 4, 2015                *s/ Janie S. Mayeron*
                                            JANIE S. MAYERON
                                            United States Magistrate Judge

**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **September 11, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Any response to objections shall be served and filed by **September 18, 2015**.  All briefs filed under this Rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.